**ORAL ARGUMENT REQUESTED**

**No. 23-1262**

---

# United States Court of Appeals for the Tenth Circuit

---

MARK JAY KRUM,
*Plaintiff Counterclaim Defendant - Appellant,*
v.
CHUBB LIMITED; CHUBB GROUP HOLDINGS INC.; CHUBB INA HOLDINGS
INC.; FEDERAL INSURANCE COMPANY; STEVEN W. MORTENSEN; MATTEW
WITCHER; CELIA SANTANA; DALE KRUPOWICZ; PERSONAL RISK
MANAGEMENT SOLUTIONS, LLC,
*Defendants - Appellees,*
AND
GREAT NORTHERN INSURANCE COMPANY,
*Defendant Counterclaimant - Appellee.*

---

*On appeal from the United States District Court
for the District of Colorado*
No. 1:20-cv-03616-RM-NRN
*Honorable Raymond P. Moore*

---

## APPELLANT'S OPENING BRIEF

---

Bradley A. Levin
Levin Sitcoff Waneka
455 Sherman St., Ste. 490
Denver. CO 80203
tel: 303.575.9390
brad@lsw-legal.com

Mark Jay Krum
Mark Jay Krum, Esq.
New York, NY
NY State Bar No. 2432243
P.O. Box 6186
Avon, CO 81620
tel: 215.605.8200
MarkJayKrum@aol.com

J. Carl Cecere
State Bar No. 24050397
CECERE PC
6035 McCommas Blvd.
Dallas, Texas 75206
tel: 469.600.9455
ccecere@cecerepc.com

*Counsel for Appellant
Mark Jay Krum*

# TABLE OF CONTENTS

Table of authorities......................................................................................iv

Statement of related cases....................................................................... vii

Glossary........................................................................................................ vii

Jurisdictional statement......................................................................... viii

Statement of the issues ..............................................................................ix

Introduction....................................................................................................1

Statement of the case ..................................................................................4

    A.    Krum builds, lives in, and operates the "World's Greatest Ski Lodge."..................................................................................4

    B.    Krum attempts to obtain appropriate coverage for his unique home. ................................................................................5

    C.    Krum successfully rents the property for years without incident. ...............................................................................8

    D.    GNIC denies Krum's claims after the house experiences a catastrophic insured loss. ......................................................9

        1.    FRV ("Fair Rental Value")......................................................9

        2.    ELE ("Extra Living Expenses")...........................................11

        3.    THAS ("Theater and Home Automation Systems"). .........19

    E.    Krum sues both GNIC and the Brokers, but the district court dismisses all of his claims on summary judgment...............23

Summary of the argument........................................................................25

Argument......................................................................................................29

I.    Standard of review..............................................................................29

II.    The district court erred in dismissing Krum's claims against GNIC................................................................................................30

A.   The district court erred in dismissing Krum's breach-of-contract and bad-faith claims related to the denial of his FRV benefits....................................................................30

    1.   Krum's FRV breach-of-contract claim.................................30

    2.   Krum's FRV bad-faith claim. ...............................................35

B.   The district court erred in dismissing Krum's breach-of-contract and bad-faith claims relating to the denial of his ELE benefits. ..................................................................................39

    1.   Krum's ELE breach-of-contract claims...............................39

        a.   The policy does not require Krum to "incur" out-of-pocket ELE replacement-housing costs before Chubb is obliged to provide benefits..............40

        b.   Nothing required Krum to incur ELE charges after they had been denied in order to sue for breach of contract.........................................................43

        c.   None of the ELE denials were justified. ...................44

        d.   A live dispute exists over whether Krum's ELE coverage was subject to a 60-day limitation, and Krum's interpretation is correct................................45

    2.   Krum's ELE bad-faith claim.................................................48

C.   The district court also made multiple errors in relation to Krum's THAS claim..........................................................................51

    1.   The district court erred in dismissing Krum's bad-faith claim relating to the THAS damages. .........................51

    2.   The district court also erred in denying Krum discovery related to his bad-faith claim related to the THAS.....................................................................................55

III.  The district court erred in dismissing Krum's claims against the Brokers. ...................................................................................................59

Conclusion...............................................................................................62

Request for oral argument ...................................................................63

Certificate of compliance ....................................................................64

Certificate of digital submission ........................................................65

Certificate of service ...........................................................................66

Addendum:

    Order on Discovery Dispute (Feb. 27, 2023) ............................................tab 1

    Order (Aug. 15, 2023)...................................................................................tab 2

    Amended Final Judgment (Sept. 23, 2023)................................................tab 3

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby. Inc.*,
    477 U.S. 242 (1986). ..................................................................29, 35

*Bailey v. Allstate Ins. Co.*,
    844 P.2d 1336 (Colo. App. 1992) ..............................................39

*Bankruptcy Estate of Morris v. COPIC Ins. Co.*,
    192 P.3d 519 (Colo. App. 2008) ................................................36

*Blakely v. USAA Cas. Ins. Co.*,
    500 Fed. App'x 734 (10th Cir. 2012) .........................................53

*Burke v. Utah Transit Auth. & Local 382*,
    462 F.3d 1253 (10th Cir. 2006) .................................................30

*Chaparral Res., Inc. v. Monsanto Co.*,
    849 F.2d 1286 (10th Cir. 1988) .................................................44

*DePhelps v. Safeco Ins. Co. of Am.*,
    65 P.3d 1234 (Wash. App. 2003) ...............................................31

*Dunn v. Am. Family Ins.*,
    251 P.3d 1232 (Colo. App. 2010) ..............................................50

*Gibbons v. Ludlow*,
    304 P.3d 239 (Colo. 2013) ...................................................59, 61

*Goodson v. Am. Standard Ins. Co. of Wisconsin*,
    89 P.3d 409 (Colo. 2004) (en banc) ...........................................38

*KAT Construction Management v. Safeco Ins. Co. of Am., No. 19-cv-02981-
    RM-KLM*,
    2022 WL 136905 (D. Colo. Jan. 14, 2022) ................................42

*Mata v. Saiz*,
    427 F.3d 745 (10th Cir. 2005) ...................................................29

*Peden v. State Farm Mut. Auto. Ins. Co.*,
841 F.3d 887 (10th Cir. 2016) ..............................................38, 48

*Por Boy Stores, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-CV-00990-RM-MEH, 2022 WL 2064930 (D. Colo. June 8, 2022) (Moore, J.) ......................53

*Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*,
960 F.3d 1255 (10th Cir. 2020) ...........................................34

*Sanderson v. American Family Mutual Insurance Co.*,
251 P.3d 1213 (Colo. App. 2010)..........................................52

*Sandoval v. Unum Life Ins. Co. of Am.*,
952 F.3d 1233 (10th Cir. 2020) ..............................................36, 48

*Shero v. City of Grove*,
510 F.3d 1196 (10th Cir. 2007) ...........................................29

*Travelers Ins. Co. v. Savio*,
706 P.2d 1258 (Colo. 1985)..............................37, 41, 49, 51, 54

## Statutes

Colo. Rev. Stat. § 10-3-1115(1)(a)......................................36, 48, 50

Colo. Rev. Stat. § 10-3-1115(2)..........................................48

## Other Authorities

American Bar Association, *Annotations to the Homeowners Policy* (3d ed. 1997)..........................................................................31

BLACK'S LAW DICTIONARY (11th ed. 2019) ..............................43

Jason Blevins, *The day skiing died: Inside the historic day coronavirus forced Colorado's ski industry to shutter*, The Colorado Sun, Apr. 15, 2020, https://coloradosun.com/2020/04/15/colorado-ski-resorts-shutdown-backstory/..........................................................................18

*Miriam Webster Online*..........................................................32

NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010)..............30, 32, 35

RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981) ................................44

**Regulations**

Colorado Dep't of Reg. Agencies, Div of Ins. Bulletin No. B-5.26 (*Insurer Requirements Related to Disputed Claims Subject to Appraisal*). ............22

**Rules**

Tenth Circuit Rule 28.1(A)................................................................. viii

## STATEMENT OF RELATED CASES

There are no prior or related appeals to this appeal.

## GLOSSARY

ELE—Extra living expenses

FRV—Fair rental value

GNIC—Great Northern Insurance Company

PRMS—Personal Risk Management Solutions, LLC

THAS—Theater and Home Automation Systems

# JURISDICTIONAL STATEMENT

This is an insurance coverage dispute between an insured, Mark Jay Krum, the policy's insurer, Great Northern Insurance Company ("GNIC"), and the brokers that procured the policy, Personal Risk Management Solutions, LLC ("PRMS"), and its members Celia Santana and Dale Krupowicz (the "Brokers"). (App.Vol.1 at 65-150, App.Vol.2 at 481-553).[1] All of Krum's claims were dismissed in a final summary judgment. (App.Vol.20 at 3212-3230). The district court had jurisdiction to enter that judgment because of diversity of citizenship under 28 U.S.C. §1332. On October 5, 2023, Krum timely appealed that final judgment to this Court (App.Vol.20 at 3264), which has jurisdiction over this appeal under 28 U.S.C. §1291.

---

[1] Pursuant to Tenth Circuit Rule 28.1(A), Krum will cite to Appellant's appendix by volume and page number as follows: "App.Vol.[volume] at [page]."

# STATEMENT OF THE ISSUES

I.    Was the district court wrong to grant summary judgment on Krum's breach-of-contract claim relating to the denial of his FRV benefits on the basis that Krum failed to establish he "usually rents" his home to others within the contemplation of the policy's FRV coverage provision, when Krum:

    a.    built the property to rent to others;

    b.    rented out the property for 99 days over the first 9 years he owned it;

    c.    earned over $650,000 in rent;

    d.    offers the property continuously for rent; and

    e.    was only unsuccessful in renting out the property during periods of renovation and historically bad snowfall?

II.    Was the district court wrong to grant summary judgment on Krum's breach-of-contract claims relating to GNIC's denial of his ELE benefits when:

    a.    nothing required Krum to "incur" out-of-pocket costs for ELE replacement housing benefits before being entitled to recover them from GNIC—especially after GNIC had refused to approve those benefits nine times;

    b.    genuine issues of material fact exist on whether each of GNIC's refusals was justified; and

    c.    a live dispute exists over whether the policy contains a 60-day limit on ELE benefits, and Krum has the better end of that dispute?

III.    Was the district court wrong to grant summary judgment on Krum's bad-faith claims against GNIC, when Krum presented genuine issues of material fact concerning whether GNIC dismissed Krum's claims without a reasonable basis and otherwise engaged in deceptive, dilatory, unethical, and improper conduct in handling his claims?

IV. Did the magistrate judge abuse its discretion in ordering, and the district court err in affirming, that Krum could not proceed with a deposition of Chubb Senior Vice President Joseph R. Smith concerning GNIC's handling of Krum's THAS claim when:

    a.    Krum bears no responsibility for the fact that this request to depose Smith came after the expiration of the discovery deadline; and

    b.    Smith possesses unique knowledge about an improper settlement offer that GNIC made to Krum regarding his THAS claim that no other witness is willing or able to confirm?

V. Was it wrong for the district court to grant summary judgment on Krum's breach-of-contract, negligence, and breach-of-fiduciary-duty claims against the Brokers for lack of causation, when:

    a.    according to what the district court held, the policy contains *conditions* on coverage—requiring Krum to demonstrate nearly constant previous rentals to trigger FRV coverage and establish his "usual vacation occupancy" to obtain ELE benefits —that would not have been present if the Brokers had placed Krum in a policy containing "maximum" and "unlimited" FRV and ELE coverage; and

    b.    despite what the district court held, Krum has established his entitlement to FRV and ELE benefits, meaning the policy's *limits* on coverage—like its 15-day limit on FRV benefits and the supposed 60-day limit on ELE coverage—come into play, which also would not have been present in a policy containing "maximum" and "unlimited" FRV and ELE coverage?

**INTRODUCTION**

This is the story of a well-respected trial attorney, Mark Krum, who set out to build the World's Greatest Ski Lodge: a one-of-a-kind retreat that is his dream home, his most significant asset, and an important business venture, earning five-figure nightly rental fees from the top end of the luxury ski vacation market.

As both a cautious homeowner and prudent businessman, Krum sought appropriate insurance coverage for this unique and valuable asset. He sought to safeguard the home through a policy that would cover the dwelling and its many luxury furnishings, as well as provide suitable replacement housing if the dwelling became uninhabitable. He sought to shield the business against a loss of rental income that might occur from some catastrophic event. He clearly expressed to the Brokers that these extra-living expenses and lost rental protection had to be comprehensive: "no exceptions." (App.Vol.9 at 2092, 2099 [244:20-245:7]).

The Brokers led Krum to believe that the Chubb policy they recommended would provide the comprehensive coverage he needed.[2] But

---

[2] Chubb acts through various writing companies, including GNIC, which is the Chubb writing company that issued the Chubb policy that covered Krum's
(Continued . . .)

Krum's dream home became an insurance nightmare on Christmas Eve 2019, when a broken sprinkler head flooded all four levels of his home. That incident revealed that the Brokers had not provided the comprehensive coverage they promised, his policy contained conditions and limitations that were incompatible with his insurance needs, and GNIC and the Chubb Adjusters, in administering Krum's policy benefits, would stretch those conditions and limitations beyond recognition to deny him coverage.

The district court erroneously dismissed all of Krum's claims against GNIC and the Brokers. While that decision occurred in the context of a one-of-a-kind luxury ski house with specialized insurance, it nonetheless affects the rights of homeowners nationwide, because the court's errors concern interpretation and application of provisions appearing in virtually all homeowner policies.

Those errors are severe. In rejecting Krum's claim to recover his home's fair rental value ("FRV"), the district court mistakenly interpreted a provision

_____

home at the time of the insured loss. (App.Vol.1 at 68-69, 86-87). Krum has sued several other Chubb entities in this action. (App.Vol.1 at 65). The district court dismissed Krum's claims against those Chubb entities other than GNIC (App.Vol.1 at 42; Vol. 20 at 3179-3180), and Krum does not challenge those rulings.

appearing in most homeowner policies to impose a condition precedent requiring that the property be rented out continuously in the period immediately preceding any covered loss before FRV coverage would be triggered. Through that ruling, insureds who try—but fail—to rent a property in the period immediately before a catastrophic event (because of temporary circumstances beyond their control) receive no FRV coverage.

Further, the district court interpreted other routine language in the policy's provision for "extra living expenses" ("ELE") to require insureds who have already suffered catastrophic losses to incur additional out-of-pocket expenses for replacement housing before being entitled to recover them— even when the insurer has already *refused* to approve those out-of-pocket expenses.

The district court also improperly rejected Krum's bad-faith claims, thereby condoning a variety of delay tactics, deceptive, unethical, and otherwise improper conduct by GNIC and Chubb Adjusters that cost Krum extensive time, expense, and headaches he should not have had to endure— and that would be ruinous to other insureds.

It is therefore vital that the Court reverse the decision below.

## STATEMENT OF THE CASE

### A. Krum builds, lives in, and operates the "World's Greatest Ski Lodge."

Mark Krum is one of the leading white-collar criminal defense attorneys in the United States. *See Krum Law: Attorneys & Counselors at Law*, https://krumlaw.com/mark-jay-krum/. And although his legal prowess regularly brings him into courtrooms all over the country, he and his daughter have long considered Beaver Creek, Colorado to be home.

An avid skier, Krum set out to build the "World's Greatest Ski Lodge"— a place he could enjoy with family, friends, and business associates, and also rent to the top slice of the luxury vacation rental market. www.mjpropertiesllc.com. In 2010, he purchased a house situated on 2.8 acres directly on the slopes of the Beaver Creek Resort, one of North America's top skiing destinations. (App.Vol.14 at 2396, 2399; Vol.9 at 2092, 2099 [244:7-19]). And Krum's 2011-2012 multi-million-dollar renovation of that property put the lodge in a class of its own. (*Id.*) The 11,000 square-foot property now sleeps 21 people comfortably and provides direct ski-in ski-out access. (*Id.*) The lodge also contains many world-class antiques and amenities, such as a private indoor basketball court, a 26-foot climbing wall, a private bar and game room, access to a former-Olympian ski instructor, and a devoted, professionally

groomed ski run—aptly named "Krum's Run"—connecting the property to the resort. (*Id.*; App.Vol.1 at 154-202; Vol. 2 at 554-590, App.Vol.3 at 614-625).

The lodge's capstone feature is its "Theater and Home Automation Systems" (the "THAS"), developed by Frankentek Residential Systems LLC, an award-winning designer of advanced luxury home electronic systems. (App.Vol.2 at 582; Vol.7 at 1865-1868; Vol.14 at 2399). The lodge also boasts an "owner's quarters," separate from the main house, where Krum, his family, and guests can stay while the remainder of the property rents out.

The result is Krum's ultimate dream house and a rental property widely regarded as "one of the most exclusive rental properties in all of Vail Valley," renting out for up to $20,000 a night. (App.Vol.1 at 281-283; Vol.14 at 2463-2466; Vol.9 at 2082-2087).

**B.    Krum attempts to obtain appropriate coverage for his unique home.**

Krum sought to obtain insurance coverage appropriate for both his unique home and lucrative rental business. So, in June 2010, even before purchasing the property, he had discussions with the Brokers, who claimed to specialize in the "risk management needs of high-net-worth individuals" to talk about his insurance needs. (App.Vol.9 at 2093, 2097-2098 [237:15-243:13]; Vol.6 at 1487, 1500, 1495-1499). The Brokers promised that they were

"specialists in personal insurance," they represented the "insured, not the insurer," and they would "always act in [Krum's] best interest." (App.Vol.9 at 2091-2092, 2097 [239:3-11]; Vol. 13 2324-2336).

From Krum's first discussions with the Brokers in the summer of 2010, he informed them that the property would be both his most significant personal asset and a high-end luxury residential rental property that would rent out for "30 days" per year. (App.Vol.9 at 2093, 2098-2099 [243:10-245:22], Vol.12 at 2264-2267). Indeed, after Krum received significant income during the first ski season he owned the property, he specifically asked the Brokers to determine whether the high rentals he anticipated receiving after completion of renovations—in the nature of "$100K to $200K"—might complicate coverage. (App.Vol.9 at 2099 [245:18-246:3]; Vol.14 at 2388-2389). Accordingly, Krum tasked the Brokers with procuring coverage that would provide appropriate protection for both his home and his business—including "maximum" and "unlimited" ELE and FRV coverage—with "no exceptions." (App.Vol.9 at 2093, 2099 [244:20-245:7]).

The original policy the Brokers procured on Krum's behalf from Chartis Property Casualty Co. provided exactly the coverage Krum had requested, including "maximum" and "unlimited" ELE and FRV. (App.Vol.15 at 2622,

2630-2631). But in August 2011, the Brokers informed Krum that the Chartis policy's annual premium would increase nearly 15-fold (from $3,776 to $52,559) because Krum's renovations triggered the policy's "construction surcharge." (App.Vol.12 at 2270). Krum agreed with the Brokers that they would try to find a different policy providing the same comprehensive coverage as the Chartis policy with a lower construction surcharge. (App.Vol.9 at 2092, 2099-2100 [246:4-250:2]; Vol.6 at 1487, 1501-1504).

The Brokers proposed a new Chubb policy (App.Vol.6 at 1473), and Krum requested that the Brokers perform a comparison between the Chartis policy and the proposed new policy to confirm that the proposed Chubb policy offered no significant differences in coverage, including the same "maximum" and "unlimited" ELE and FRV. (App.Vol.13 at 2300-2303). The information that the Brokers provided to Krum in that comparison led him to conclude that there were no material differences between the Chartis and Chubb policies. (App.Vol.6 at 1487, 1503-1507, 1516-1517, 1522-1523). Accordingly, in reliance on that comparison, and based on the Brokers' recommendation, Krum agreed to switch policies. (*Id.*)

That Chubb policy renewed annually (App.Vol.6 at 1496-1497, 1507), and the Brokers on multiple occasions informed Krum they had "carefully

review[ed]" the renewal Chubb policies to ensure they maintained the same coverages as the Chartis policy. (*Id.*; App.Vol.9 at 2092, 2100 [249:3-24]).

## C. Krum successfully rents the property for years without incident.

For a time, all went well. Within six months of purchasing the property, Krum had already rented it out for 43 days. (App.Vol.13 at 2337-2339). Except during the period in 2011-2012 when Krum was renovating the property, he was able to rent it out every year through 2016—for a total of 99 days, obtaining more than $650,000. (*Id.*; App.Vol.9 at 2092, 2100 [250:21-251:25], 2082-2087; Vol.13 at 2309-2323; Vol.6 at 1623-1635).

Yet Krum was not able to rent the property during the 2017 and 2018 ski seasons at an acceptable rate, because a decade-low snowfall in the 2017-2018 season significantly depressed rentals in both that season and the next. (App.Vol.17 at 2803-2807). Nevertheless, throughout that time, Krum actively marketed the property for rent. He maintained a professionally designed website devoted to "the World's Greatest Ski Lodge": www.mjpropertiesllc.com. (App.Vol.14 at 2463-2470; Vol.9 at 2092, 2101 [253:10-254:10]). In November 2019, immediately before the incident, Krum was in discussions with a real estate broker about listing and marketing the property for rent during the upcoming 2020 ski season. (App.Vol.14 at 2463-2470).

### D. GNIC denies Krum's claims after the house experiences a catastrophic insured loss.

Unfortunately, on Christmas Eve 2019, a sprinkler head inside Krum's home failed, flooding and damaging all four levels of his home. (App.Vol.9 at 2092, 2096 [233:2-10]). Most of the home was rendered uninhabitable and unsafe. (App.Vol.5 at 1145, 1204 [234:7-236:19]). Krum promptly made a claim under the then-applicable version of his Chubb policy with GNIC (App.Vol.14 at 2396, 2400-2402) and was able to resolve the majority of the claims with his insurer relating to the dwelling and its contents. Yet the parties disputed three categories of claims: the FRV coverage, the ELE coverage, and the damage to the THAS. (App.Vol.18 at 2870-2879).

#### 1. FRV ("Fair Rental Value").

The first dispute concerned Krum's claim for FRV losses, which are covered under the policy's "extra coverages" for "additional living expenses"—which were insured up to 30% of the house's value, or $2,069,100. (App.Vol.6 at 1538-1589). The policy provided the following in FRV coverage:

> If a covered loss makes part of your house or other permanent structure which you usually rent to others uninhabitable, we cover its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition.

(App.Vol.6 at 1562). Against Krum's express wishes that the Brokers obtain "unlimited" and "maximum" FRV coverage with "no exceptions," however, the GNIC policy only covered FRV losses "for up to 15 days." (*Id.*) And while there is no dispute that Krum's home remained uninhabitable for more than two years after the covered incident—indeed, it remains uninhabitable to this day—GNIC failed to offer Krum even one day of FRV benefits. (App.Vol.18 at 2922-2927; Vol.19 at 3094-3112; Vol.20 at 3247-3250, 3244).

GNIC offered various reasons for refusing to provide Krum FRV benefits. At first, GNIC insisted that Krum had to prove he had "incur[ed]" actual FRV losses, demanding that he provide signed leases that went unfulfilled because of the property's uninhabitability. (App.Vol.14 at 2396, 2409; Vol.11 at 2180, 2184 [87:5-89:6, 96:4-97:15). But GNIC's corporate representatives later abruptly dropped this contention during depositions in this case—without ever informing their insured of this changed position. (App.Vol.14 at 2396, 2409).

GNIC later settled on a different reason for denying Krum's FRV claim, arguing that Krum could not demonstrate that he "usually rents" the property as required under the policy's FRV provision because he had no tenants in the years immediately preceding the covered event—a consequence of those

years' historically bad snowfall. (App.Vol.16 at 2683 n.8; Vol.17 at 2803-2807). In making that determination, GNIC completely ignored that Krum specifically built the property to rent, had successfully rented out the property 99 days, had earned more than $650,000 in rent, and had continually marketed the property for rent. GNIC even overlooked that less than a week after the flooding occurred, a luxury renter contacted Krum, hoping to rent the property on two separate occasions in February and March 2020 at the listed rental rates. (App.Vol.14 at 2467-2470, 2463-2466). Thus, according to GNIC, the policy Krum purchased to provide him *maximum and unlimited* protection from lost rentals gave him *no* protection even when he experienced actual lost rentals.

## 2. ELE ("Extra Living Expenses").

The next dispute concerned Krum's claims under the policy's ELE provision, which provided:

> If a covered loss makes your house or other permanent structure uninhabitable during your usual vacation occupancy, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use.

> We will pay for the boarding of your domestic animals displaced from another permanent structure even when you have not been displaced by the covered loss. We cover these increases for the reasonable amount of time required to restore your house or other

permanent structure to a habitable condition, or if you or members of your household permanently relocate, the shortest amount of time required to settle elsewhere. However, if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, we only cover the increase in your normal living expenses incurred by you for the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss. We cover these extra living expenses for up to 60 days, even if the policy period ends during that time.

(App.Vol.6 at 1561-1562). These ELE expenses were also covered up to $2,069,100. (App.Vol.6 at 1552, 1561,). Yet GNIC only provided Krum $22,451.77 in ELE coverage. (App.Vol.6 at 1475). This amount included 60 days of extra food expenses, dog boarding, and only 7 days of emergency housing at a "temporary hotel." (App.Vol.6 at 1483).

Yet after initially telling Krum to "move into" this temporary hotel and that GNIC would "take over billing" throughout the period his home was uninhabitable (App.Vol.17 at 2814-2815), GNIC and the Chubb Adjusters repeatedly refused to approve Krum's requests for suitable permanent housing—despite knowing that time was of the essence. Within two weeks of the flooding, Chubb's own scientist had confirmed that Krum must "obtain alternative housing as soon as possible"—and remediation specialists had to don protective clothing upon entering the property. (App.Vol.14 at 2396, 2402,

2412; Vol.5 at 1238, 1318-1319 [321:11-323:20], 1145, 1203-1206 [233:11-242:9]; Vol. 16 at 2732, 2734 [259:17-260:1]). Krum also repeatedly informed GNIC that he needed to make permanent replacement housing arrangements quickly, both to resolve his own "living situation," and because of "professional, family and personal guests scheduled to come throughout February." (App.Vol.14 at 2417-2418; Vol.6 at 1600).

Between January 1, 2020 and March 2, 2020, Krum made nine separate requests for "suitable" replacement housing. (App.Vol.1 at 236-237, 233-234, 250-251, 266-272; Vol.14 at 2408-2412, 2416, 2420-2422, 2424-2427; Vol.17 at 2779-2784, 2787-2789; 2791, 2808-2815; Vol. 6 at 1598-1600; Vol. 5 at 1145, 1219 [297:13-301:19]). Either through delay or explicit refusal, GNIC denied every single one. (*Id.*)

Again, the reasons for GNIC's denials shifted over time. At first, the dispute revolved around whether the replacement housing matched his "usual standard of living" as promised under the policy. Krum offered four different housing options he was willing to consider. (*Id.*) GNIC offered three of its own, although none of GNIC's options were remotely comparable to Krum's home—with *monthly* rental rates (for no less than 6-month rentals) that were comparable to the *daily* rental rate of his own home. (App.Vol.1 at 234-237;

Vol.4 at 1033-1034, 1056 [87:3-89:8, 89:18-90:4; Vol.6 at 1598; Vol.16 at_2728; Vol.17 at 2792-2793; Vol.18 at ,2884-2888). GNIC put off the options Krum offered at least five different times with the excuse that Chubb was "currently reviewing" them, knowing with each of these delays, options would likely be lost, and Krum's time spent finding and negotiating each of these options would be wasted. (App.Vol.17 at 2810-2815, 2809; Vol.14 at 2418; Vol.9 at 2092, 2101 [255:5-9]). Simultaneously, Chubb Adjusters asked Tony Pierce of ServePro (the company handling the remediation and demolition of the property) to pressure Krum into staying at "The Ritz-Carlton until [Chubb and Krum] could agree to a long term stay at a comparable property." (App.Vol.1 at 253-254).

Then, beginning on January 17, 2020—more than three weeks after Krum's home had become uninhabitable—the excuses changed again. After acknowledging, as of January 2, 2020, that Krum had qualified for "temporary housing during remediation/repairs" under the policy's ELE coverage (App.Vol.1 at 236-237), GNIC began to insist his entitlement to ELE benefits was still undetermined.

GNIC demanded that to obtain his ELE benefits, Krum had to prove his "usual vacation occupancy"—a term appearing in the policy only because

the Brokers wrongly placed Krum in a "vacation" policy rather than a homeowner's policy, in which homeowners' occupancy of their homes is normally presumed. (App.Vol.14 at 2396, 2414-2415; Vol.5 at 1145, 1228 [333:20-25]; Vol.6 at 1487, 1517-1518). GNIC insisted that to establish this "usual vacation occupancy," Krum had to provide a plethora of supporting information demonstrating the frequency of his visits to the property, including: (1) 2 years of "flight reservations"; (2) contact information for the "management company that prepares the house prior to your arrival"; (3) contact information for his "alarm company'"; and (4) "2 years of electric and water bills" to determine "whether and/or what extent ELE coverage applies." (App.Vol.17 at 2821, 2834-2835; Vol.14 at 2396, 2414-2415).

Krum immediately began compiling this voluminous information. Within a week he had provided GNIC with the two years of electric and water bills it had requested and more than six months of flight information (reflecting flights to and from Denver and Eagle Vail airports from June 12, 2019 to January 6, 2020) (App.Vol.1 at 209, 225, 258-261). Krum also provided the requested contact information for his alarm company. (App.Vol.1 at 276-279). Within another two weeks—by February 7—Krum had provided another year's worth of flight information (documenting his flights between October

30, 2018 and June 12, 2019). (*Id.*). These records showed that Krum had stayed at the property for 277 days in the two years before it flooded—an average of more than 11 days a month. Yet GNIC was not satisfied with this documentation or any other documentation Krum would provide over the next few weeks. (App.Vol.14 at 2396, 2415-2424, 2428-2431; Vol.1 at 209, 225, 258-261, 265, 276-279).

Once again, GNIC's reasons for rejecting this documentation were shifting, pretextual, and disingenuous. GNIC falsely accused Krum of refusing to provide supporting "records or official documentation of [Krum's] flights"—in a response to an email in which Krum enclosed 13 attachments of documentation of those flights. (App.Vol.1 at 265, 285-289; Vol.17 at 2779-2780).

GNIC then rejected the relevance of the very flight records it had demanded. It insisted that Krum's flights to and from the Denver and Eagle airports did not "document" Krum's visits to the property—raising the unlikely possibility that Krum might travel to Denver or Vail without staying in his own home. (App.Vol.1 at 287). GNIC refused to accept Krum's personal assurance that he "did not fly" to either of those airports "for any other reason than … spending time at my Beaver Creek residence" (App.Vol.14 at 2429;

Vol.1 at 285)—even after Krum offered to provide that assurance under oath at GNIC's convenience (App.Vol.1 at 231; Vol.17 at 2820-2821, 2841).

GNIC offered no reason to doubt Krum's sincerity. Yet instead of relying on the information he had already provided, the Chubb Adjusters demanded *still more* information on February 7—in the third month after the damage to Krum's residence—insisting that Krum provide two years of rental-car receipts. (App.Vol.14 at 2391-2394). Throughout this time, GNIC refused to grant any of Krum's housing ELE requests, even though remediation on his home had begun (App.Vol.14 at 2421), his February guests were scheduled to arrive, and he was staying in part of the home without a functioning kitchen. (App.Vol.14 at 2395-2396, 2407).

Indeed, the impending arrival of one such set of guests provided GNIC with one more opportunity for a pretextual denial. As Krum's daughter planned to come home from college with some friends in February, Krum asked that they be able to stay with him in a suite of rooms at the Ritz—a request that GNIC could hardly deny as it had previously tried *to pressure* Krum to stay at the Ritz. Yet GNIC rejected this request too. It insisted the policy's ELE coverage only extended to Plaintiff's daughter if she normally resided with him (App.Vol.17 at 2779-2782)—even though Krum himself would

clearly be staying with them, and his vacation policy covered a standard of living that unquestionably allowed him to accommodate guests who did not normally live with him.

It would not be until March 19, nearly four months into the process, that GNIC would offer, "as a sign of good faith," to provide any accommodation of its own for its insured who was put out of his home: another 13-night stay at the Ritz. (App.Vol.17 at 2786-2789; Vol.14 at 2431-2432). But even this purported accommodation was hardly reasonable—nothing more than an offer to "reimburse" him for up to "$5,000 a night" (for a property that rents out for four times that amount), which was subject to a reservation of rights that GNIC might take the money back once it determined his "usual vacation occupancy." (*Id*.) GNIC also knew that this offer came too late—because by March 19, the COVID-19 pandemic was in full swing, most of the alternative rentals Krum had requested were unavailable, and the Ritz Carlton, Vail, and Beaver Creek had all announced that they were closed until further notice. *See* Jason Blevins, *The day skiing died: Inside the historic day coronavirus forced Colorado's ski industry to shutter*, The Colorado Sun, Apr. 15, 2020, https://coloradosun.com/2020/04/15/colorado-ski-resorts-shutdown-backstory/ (noting that Vail and Beaver Creek had closed on March 14, and the Ritz closed

on March 16). It would not be until March 27, well into the period when COVID made owning and renting a luxury ski home obsolete, that GNIC finally established Krum's "usual vacation occupancy is 60 days per year." (App.Vol.18 at 2895).

When Krum asked GNIC why it took more than 3 months to make such a simple determination, its representatives provided no answer. (App.Vol.1 at 117). Meanwhile, GNIC insisted that the policy's ELE benefits, including for replacement housing, food, and dog boarding, were limited to two months or 60 days even though GNIC had previously approved amounts for food for more than 60 days, and the original three replacement housing options it had offered were all for minimum "6-month lease term[s]." (App.Vol.14 at 2433; Vol.6 at 1483).

### 3. THAS ("Theater and Home Automation Systems").

GNIC also engaged in unreasonable and bad faith conduct in its dispute with Krum over the damage to the property's THAS. On January 27, 2020— only a month after the accident—Krum promptly provided GNIC with a detailed, itemized report prepared by Michael Pavluk, co-owner of Frankentek, the award-winning company that had designed and installed the system, stating that the cost to replace its damaged components would total

$1,200,377.70 (App.Vol.8 at 1899-1912, 1931-1935; Vol.14 at 2450-2451; Vol.2 at 440-443). Less than a month later, Krum provided GNIC with a separate report prepared by another home-theater company, SimpleTech, estimating $1,655,868.31 in repair costs. (App.Vol.8 at 1936-1970). Pavluk also gave notice in early April 2020 that he was immediately ready to proceed with rebuilding the THAS. (App.Vol.8 at 1972).

Even though Chubb's adjusters had the advantage of two separate estimates of the repair costs and more than six full days at the property to conduct their own examination of the THAS, they would not produce their own report until April 17, 2020, and their loss assessment that was over *30 times* lower than Frankentek's estimate: $39,039.22. (App.Vol.8 at 1973-1974). Two months later, on June 12, 2020, GNIC increased its total loss assessment to $128,165.00, after engaging another Chubb expert, Arash Hajjam, Ph.D. (App.Vol.8 at 1980-1981).

Deeming GNIC's unreasonable delays and lowball estimates to be unreasonable, Krum invoked the policy's appraisal process to determine the THAS's true repair costs. Under the policy's appraisal process, either party to the policy can ask for the loss to be determined by a panel of 3 appraisers. (App.Vol.8 at 1982-1995; Vol.2 at 409; Vol.6 at 1538, 1585). Each party must

select their own appraiser, and then the two appraisers select a third. (*Id.*) Yet GNIC did everything possible to prevent the appraisal process from going forward, engaging in a protracted dispute with Krum over choosing the third "neutral" appraiser. While GNIC rejected each of the qualified neutrals proposed by Krum's appraiser, Pavluk, the proposed neutrals proposed by its own appraiser, Thomas Kirkpatrick, were manifestly unqualified. One had no experience beyond "snow and ice management systems, and solid waste handling facilities;" another worked only with "large mining equipment, overhead cranes, and industrial machinery;" and a third had only "judicial experience." (App.Vol.14 at 2448-2450; Vol.2 at 445, 434-436).

This impasse over choosing an acceptable qualified neutral required Krum to undertake the time-consuming and expensive process of filing a lawsuit to ask the district court to choose the neutral appraiser. The district court rejected each of GNIC's manifestly unqualified candidates, and appointed Daniel Stern, one of Pavluk's well-qualified proposed neutrals that GNIC had rejected a year earlier. (App.Vol.8 at 2003-2007; Vol.14 at 2451-2452). The appraisal panel with Stern, Kirkpatrick, and Pavluk awarded Krum $1,205,000. (App.Vol.2 at 447-451). But because of GNIC's numerous delays, it took 17 months for Krum to obtain an award that was a few thousand dollars

more than Frankentek's original estimate and nearly 10 times higher than GNIC's highest loss assessment.

GNIC also failed to disclose that one of GNIC's proposed "neutral" appraisers—Craig Rice—was not neutral at all but labored under impermissible conflicts of interest and had been the subject of improper *ex parte* contacts with GNIC representatives. Under applicable Colorado regulatory requirements, GNIC was required to disclose any "ex parte" communications with the appraiser and any matter "that a reasonable person would consider likely to affect the impartiality of the appraiser" including "[a] current or previous relationship with any of the parties to the agreement … their counsel or representatives." *See* Colorado Dep't of Reg. Agencies, Div of Ins. Bulletin No. B-5.26 (*Insurer Requirements Related to Disputed Claims Subject to Appraisal*) at 1. But GNIC refused to disclose that Rice had been recommended to Chubb by Arash Hajjam, Ph.D (App.Vol.8 at 1917, 1920 [60:21-61:24], 2000-2002; Vol.5 at 1386 n.28; Vol.16 at 2690 n.20), suggesting that he would be improperly aligned with the man who provided GNIC's lowball appraisal. And Hajjam had improper "ex parte" contacts with Rice about the potential that he might be chosen as a neutral arbitrator, which GNIC never disclosed until depositions in this case. (*Id.*).

GNIC engaged in other behavior during the resolution of Krum's THAS claim that was unreasonable, unconscionable, and in bad faith. This included GNIC's failure to award Krum amounts it knew he was entitled to recover: Prior to Krum's appraisal demand, Chubb consultants informed its adjusters (and the adjusters advised their superiors) that their $128,165 loss assessment did not include costs for "low voltage wiring"—which would have added another "250K." (App.Vol. 12 at 2224-2225, 2230-2232; Vol.18 at 2865-2869). Nevertheless, GNIC made no adjustment to its June 12, 2020 loss assessment to include this amount. Then, GNIC attempted to thwart an appraisal process it knew it would lose by offering a lowball settlement of $564,000 "in lieu" of appraisal (less than half the claim was worth) that GNIC confirmed in writing and included in a statement of loss but later denied offering. (App.Vol.14 at 2444-2448; Vol.10 at 2145-2146, 2150-2153 [180:25-191:21]).

**E.    Krum sues both GNIC and the Brokers, but the district court dismisses all of his claims on summary judgment.**

In December 2020, Krum brought a lawsuit in the district court against GNIC, Santana, and Krupowicz. (App.Vol.1-2 at 65-446). In October 2021, Krum filed a separate action against PRMS in New York state court, which was removed to federal court, transferred to the District of Colorado, and consolidated with the already pending case. (App.Vol.2-3 at 474-820).

The district court granted summary judgment on each of Krum's claims against GNIC and the Brokers. It dismissed Krum's breach-of-contract claim against GNIC for denial of his FRV benefits by mistakenly interpreting a clause within the FRV provision, which extended coverage to any "part of your house … you *usually rent to others*," as imposing a condition precedent requiring insureds to demonstrate they "usually rent" the property to trigger coverage. (App.Vol.20 at 3219-3220) (emphasis added). The court then held Krum's inability to rent the property in the years preceding the flooding did not meet that condition, preventing him from receiving any FRV benefits. (*Id.*)

The court also held that GNIC was not obliged to provide Krum with ELE benefits because he had not "incurred" any replacement housing costs. (App.Vol.20 at 3218-3219). While the court acknowledged that GNIC had rejected nine of Krum's ELE requests *before* Krum could incur them, it determined each of those refusals to be immaterial, finding no evidence "that these requests were improperly denied." (*Id.*) The court then determined that Krum's challenge to GNIC's contention that the policy imposed a 60-day limit on ELE benefits to be unripe, based on its own conclusion that Krum was not entitled to *any* "ELE benefits beyond what he received." (*Id.*).

The district court also dismissed all of Krum's bad-faith claims. It found an "absence of any evidence" that GNIC acted unreasonably in denying Krum's ELE and FRV claims. (App.Vol.20 at 3222). And it found that GNIC's improper conduct throughout the process of evaluating Krum's THAS-related damages was not actionable, concluding that "Great Northern['s] duty to negotiate as a reflection of good faith was suspended once Plaintiff demanded appraisal," and otherwise finding no "evidence of unreasonable conduct" by GNIC. (*Id.*).

Finally, the court dismissed Krum's claims against the Brokers, finding that Krum could not "prove causation" for those claims. (App.Vol.20 at 3225-3226). Because the court concluded Krum "did not exhaust the coverage limits under the policy he had," it deemed "the possibility that he could have obtained more coverage (even unlimited coverage)" absent the Brokers' negligence to be immaterial. (*Id.*)

## SUMMARY OF THE ARGUMENT

None of the district court's reasons for dismissing Krum's claims against both GNIC and the Brokers can withstand scrutiny.

**FRV.** The district court misread the policy in dismissing Krum's FRV claim because the policy's provision extending FRV coverage to "part of your

house … which you usually rent to others" imposes no condition precedent reserving FRV coverage only to the insured who constantly rents the property in the period immediately before a covered loss. That provision merely defines the physical portions of the property protected by FRV coverage. Krum therefore had no obligation to show that he "usually rented" the property in order to trigger FRV coverage.

Krum made that showing in any event. A property that Krum built to rent, rented out 99 days for over $650,000, and offered continuously for rent is "usually rented." Furthermore, GNIC's refusal to consider that entire rental history rests on an interpretation of the policy—and a concept of "rent"—that is not merely incorrect but so unreasonable as to suggest bad faith. Accordingly, the district court erred in dismissing Krum's breach-of-contract and bad-faith claims related to his FRV losses.

**ELE.** The dismissal of Krum's claim challenging the denial of his nine ELE replacement-housing requests must also be reversed. Nothing required Krum to "incur" out-of-pocket replacement-housing costs before he could obtain them from GNIC—especially in the face of GNIC's repeated, explicit denials of those requests. And despite what the district court concluded, the evidence shows that each of the nine denials was improper. GNIC provided *no*

reason for denying each of Krum's pre-January 17 ELE housing requests. And as for each of the post-January 17 ELE housing denials, genuine issues of material fact exist on whether—and by what point in time—Krum had provided GNIC with sufficient information to demonstrate his "usual vacation occupancy" of the property. Moreover, despite what the district court held, a live dispute exists over whether Krum's claims for ELE benefits are subject to a 60-day limit, because Krum has requested and been denied his food and dog-boarding costs beyond that 60-day period. That denial was improper.

Krum also presented ample evidence to suggest that each of GNIC's ELE housing-benefit denials was made in bad faith. GNIC's refusal to provide Krum *any* definitive answer on his pre-January 17 ELE housing requests was no way to treat an insured whose home had been rendered uninhabitable. And GNIC's conduct after January 17, including the nearly four weeks it took to initiate the process of verifying Krum's "usual vacation occupancy," the three months it took to conclude the process, and its failure to deal honestly and fairly with Krum throughout that process, presents evidence of bad faith precluding summary judgment.

**THAS**. GNIC's misconduct in the dispute over the damage to Krum's THAS also raises questions about its good faith that precludes summary

judgment. GNIC's obligation to treat Krum fairly and honestly did not end simply because Krum invoked his appraisal right. Indeed, the strongest evidence of GNIC's bad faith arises from the appraisal process itself, because Krum only invoked that process because GNIC's initial damage assessments were unreasonably low. And the process itself bore out the unreasonableness of that assessment, resulting in an award thirty times higher than GNIC's initial loss assessment, suggesting the original was made in bad faith. And this is only the beginning of the dilatory, dishonest, and unethical conduct that GNIC engaged in during the process of determining Krum's losses, presenting further genuine issues of material fact preventing summary judgment on Krum's THAS-related bad-faith claims.

Finally, Krum's claims against the Brokers should also be reinstated. Krum can establish causation for those claims because the problems with the policy run deeper than its mere "limits" on coverage—like the 15-day limit for FRV coverage or the supposed 60-day limit on ELE coverage. Those problems also include the *conditions* on the policy's FRV and ELE coverage—including the supposed condition precedent requiring Krum to demonstrate nearly constant historic rentals to trigger FRV coverage or establish his "usual vacation occupancy" to obtain ELE benefits. If the Brokers had done as Krum

had asked and obtained *unlimited* FRV and ELE coverage similar to his Chartis policy, then these conditions would not have been included in the policy and GNIC would therefore have had no reason to deny coverage. And in any event, if the Court determines that dismissal of Krum's FRV and ELE claims was improper, then the policy's "limits" come into play and live disputes exist over whether the Brokers should have placed Krum in a policy containing those limits.

## ARGUMENT

### I. Standard of review

This Court reviews the district court's grant of summary judgment *de novo*, *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007), affirming summary judgment only if the movant has established that there is no "genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Mata v. Saiz*, 427 F.3d 745, 749-50 (10th Cir. 2005). Even where the evidence is undisputed, summary judgment is inappropriate "[i]f reasonable minds could differ as to the import of the evidence." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 250 (1986). And in determining whether summary judgment is appropriate, the Court must "view the evidence and reasonable inferences therefrom in the light most favorable" to the

nonmovant. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006).

## II. The district court erred in dismissing Krum's claims against GNIC.

The district court dismissed Krum's breach-of-contract and bad-faith claims against GINIC on each of the disputed components of insurance benefits that Krum requested. It erred each time.

### A. The district court erred in dismissing Krum's breach-of-contract and bad-faith claims related to the denial of his FRV benefits.

#### 1. Krum's FRV breach-of-contract claim.

The district court's dismissal of Krum's breach-of-contract claim for denial of his FRV benefits rested on a simple misinterpretation of "the policy's requirement that he 'usually rent to others.'" (App.Vol.20 at 3219-3220) (quoting Vol.6 at 1538, 1562). Focusing on the phrase "usually rent" in isolation, the court interpreted that provision to impose a condition precedent requiring that Krum "'normally'" or "'habitually'" maintain some specific number of rental transactions in the period immediately before the flood to enjoy FRV benefits. (*Id.*, quoting NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010). The district court therefore disregarded Krum's entire history of renting the property simply because his previous "rentals occurred four or more years ago." (App.Vol.20 at 3219).

Yet this debate over whether Krum "usually rents" the property was nothing but an irrelevant sideshow. The phrase "usually rents" does not refer to any condition precedent requiring that the property rent out for some threshold number of days before FRV coverage is triggered—much less that this magic number of rental days occur within any fixed window of time immediately before a covered loss. That is clear from the larger context in which the phrase appears, which refers to the "part of your house … which you *usually rent to others.*" (*Id.*; App.Vol.6 at 1562) (emphasis added). Such phrasing is common in standard-form homeowner's policies, and clearly limits the *portions* of mixed-use properties that will trigger FRV coverage. Where an insured reserves part of a dwelling solely for a residence and rents part out, FRV coverage exists only if the "parts of [the] building" rented out are rendered uninhabitable—not the residential portions. *DePhelps v. Safeco Ins. Co. of Am.*, 65 P.3d 1234, 1237 (Wash. App. 2003); *see also* American Bar Association, *Annotations to the Homeowners Policy*, Key 39-Section I (3d ed. 1997) (describing "fair rental value" of a mixed-use residence as the rental value of "that part of the residence premises rented to others or held for rental by you."). Krum's ability to satisfy this clause of the FRV provision was never

in doubt because Krum "usually rents" out the entire ski lodge: both the "owner's quarters" and the remainder of the house.

Still, Krum would be entitled to coverage even if he had to establish that he "normally" or "habitually" "rents" the property. The verb "rent" refers to the act of "let[ting] someone use (something) in return for payment." *Rent*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010). The term covers actual transactions whereby one "grant[s] the possession and enjoyment" of property to another "in exchange of rent" *and also* covers the practice whereby a person offers a property to the public "to be for rent." *Miriam Webster Online*. That is why hotels or motels "rent" rooms even when they have no customers. And a homeowner "usually rents" their property when they *normally offer* the property for rent, even if they sometimes take the property off the rental market.

By that definition, a genuine issue of material fact exists over whether Krum "usually rented" the lodge. Krum introduced evidence that he bought the property specifically to rent it. (App.Vol.9 at 2092, 2999 [244:13-19). Krum undertook a multi-million-dollar renovation of the property with the specific purpose of renting it to high-end clientele. (*Id.* at 2099 [245:18-246:3]). He maintained a website that continually offered the property for rent. (*Id.* at

2101 [253:10-15]). He periodically engaged brokers to help him rent the property—including in November of 2019, immediately before the covered incident. (*Id.* [253:16-19]; App.Vol.14 at 2463, 2465). Indeed, immediately after that incident, on January 1, 2020, Krum was contacted by a potential renter who found out about the property from Krum's website and wanted to rent it at its listed rate. (App.Vol.14 2463, 2465, 2467-2470). Krum earned more than $650,000 in rent, renting the house for up to $20,000 a night, for 99 days in the 9 years he owned it. (App.Vol.13 at 2337-2339). He rented it out every year except during periods of renovation and historically bad snowfall. (App.Vol.17 at 2803-2807). That meets any definition of "usually rent[ing]."

The district court disregarded this mountain of evidence, and reached a contrary conclusion, only by adopting a cramped definition of "rent" at odds with its plain meaning—as referring only to rental transactions *and not* the practice of offering property for rent. That is the only way the court could deny that Krum's "allegations about his intent to rent the property" and fielding "others' inquiries about the possibility of renting the property" was evidence of "renting" it. (App.Vol.20 at 3219). Yet the court cited no source adopting this confined and restrictive definition of "rent." And the court's adopted definition does not comport with GNIC's representatives' own definition, which

encompasses both rental transactions and practices in which property is "held for rent." (App.Vol.16 at 2713-2714, 2719 [278:12-279:13]). In any event, to the extent the term "rent" is "susceptible to more than one reasonable interpretation," the district court recognized that it must be "construed broadly in favor of the insured." (App.Vol.20 at 3217) (citing *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020)). That means the term "rent" must be interpreted to include both rental transactions *and* the practice of holding a property out for rent.

Furthermore, even the district court's manifestly incorrect and unjustifiably narrow interpretation of the phrase "usually rent" cannot support employment of an arbitrary "four-year" lookback period to reject coverage. Even a property that does not rent out in a three-year and 11-month period should still be considered "usually" rented, when: (i) the property rented out five of the six years before that lookback period; (ii) the property is *offered* for rent throughout the lookback period; (iii) the owner's inability to obtain renters for two ski seasons during the lookback period resulted directly from historically bad snowfall entirely beyond his control; and (iv) the last full ski season of the lookback period had not occurred when GNIC denied coverage. After all, as the district court recognized, the term "usually" means

"under normal conditions." (App.Vol.20 at 3220) (citing NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010)). And once-in-a-decade snow droughts are not "normal conditions." Indeed, the very idea that insureds who are *trying* to rent their homes might lose FRV coverage simply because their attempts prove unsuccessful makes no sense and causes insureds to lose coverage they legitimately believe they have. Leaving the district court's mistaken interpretation of this standard-form provision in place will therefore cause real problems for many homeowners beyond Krum himself.

Accordingly, Krum's entire history of owning and renting the property must be considered in determining whether he "usually rents" it. And because "reasonable minds" could disagree whether Krum's evidence met that undefined and uncertain threshold, *Anderson*, 477 U.S. 242 at 250, summary judgment was inappropriate on Krum's breach-of-contract claim related to GNIC's denial of his FRV coverage.

### 2. Krum's FRV bad-faith claim.

Krum's bad-faith claim relating to the denial of his FRV claim also should not have been dismissed. As the district court recognized, Colorado law imposes a duty of good faith and fair dealing in all insurance contracts by statute and common law. (App.Vol.20 at 3221). Under the common-law

standard, an insurer acts in bad faith and in violation of this duty when it "act[s] unreasonably and knew or recklessly disregarded the unreasonableness of its conduct." (App.Vol.20 at 3220-3221) (citing *Sandoval v. Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1236 (10th Cir. 2020)). An insurer violates the statutory duty of good faith when it "delay[s] or deni[es] payment of a covered benefit without a reasonable basis" (App.Vol.20 at 3221) (citing Colo. Rev. Stat. §10-3-1115(1)(a)), regardless of whether the delay or denial was "knowing or reckless," *Sandoval*, 952 F.3d at 1236.

An "insurer's bad faith is ordinarily a question of fact to be determined by a jury." *Bankruptcy Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 524 (Colo. App. 2008). And Krum has presented evidence that GNIC's denial of his FRV benefits was so objectively unreasonable as to satisfy both the statutory and common-law standards of bad faith. Chubb representatives have admitted on behalf of GNIC that their definition of "usually renting" had no established history and did not derive from any reasoned authority or legal research. Rather, they developed it at a special post-claim meeting in early January 2020 among numerous Chubb participants, including some of the company's highest-ranking executives. (App.Vol.16 at 2713-2714, 2719 [279:9-281:24]).

The definition that those officials came up with is manifestly unreasonable. Any interpretation of the "usually rents" provision requiring a person who purchases FRV coverage to demonstrate a history of renting the property simply to obtain the coverage he bought falls outside the realm of "fairly debatable" coverage disagreements. *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275-76 (Colo. 1985). So too does any interpretation imposing a look-back period that arbitrarily excludes the majority of Krum's rental history, ignores Krum's active and dedicated efforts to market the property for rent, and does not account for circumstances beyond Krum's control. And when that misinterpretation of the policy varies from how "usually rent" policy provisions are applied virtually everywhere else in the homeowners' context— where they designate the portion of the property covered by FRV benefits and do not impose conditions precedent to coverage—that suggests the misinterpretation was deliberate and knowing or in "reckless disregard" of the truth as required for a common-law claim. *Savio*, 706 P.2d at 1272.

The district court erred in concluding otherwise. It determined there was an "absence of evidence that GNIC acted unreasonably" in denying Krum's FRV claim, but only because it accepted GNIC's manifestly unreasonable interpretation of the FRV provision and therefore deemed it

necessary for Krum "to refute the fact that the property had not actually been rented for nearly four years preceding the insured event." (App.Vol.20 at 3221-3222). But a policy interpretation cannot be deemed reasonable as a matter of law simply because one district court mistakenly views it as correct. Rather, the reasonableness of the insurer's conduct "is determined objectively under industry standards." *Peden v. State Farm Mut. Auto. Ins. Co.*, 841 F.3d 887, 891 (10th Cir. 2016) (citing *Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004) (en banc)). Those industry standards are normally established through the aid of "expert opinions or state law." *Id.* And Krum's adjustment expert Robert Landow concluded that "[n]o reasonable basis exists for Great Northern and Chubb unreasonably delaying and denying Mr. Krum's coverage requests and claims pursuant to the … FRV provision[] of the Policy." (App.Vol.14 at 2396, 2455).

As Landow noted, the conclusion that GNIC's reasons for denying FRV coverage were in bad faith is only reinforced by its other, abandoned reason for denying coverage—that an FRV loss must actually be "incurred" and demonstrated through a signed "lease agreement" to be recoverable. (App.Vol.14 at 2396, 2409). That conclusion was manifestly incorrect, as the policy does not cover actual lost rentals, but rather the "fair rental value" of

the property—what it *could* obtain in rent regardless of what it *actually* lost in rent. Landow explained that it was unreasonable for GNIC to even create a mistaken impression to the contrary—much less refuse to disclose that it had abandoned that position until depositions in this case. (*Id.*). The obligation of good faith requires an insurer to "deal honestly and fairly" with its insured. *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1340 (Colo. App. 1992). GNIC failed that basic obligation through the manifestly incorrect, contrived, and shifting pretextual bases it concocted to deny Krum's FRV claim rather than pay it. It was therefore wrong for the district court to dismiss Krum's bad-faith claims relating to his FRV losses.

**B.   The district court erred in dismissing Krum's breach-of-contract and bad-faith claims relating to the denial of his ELE benefits.**

It was likewise incorrect for the district court to reject Krum's claims relating to GNIC's denial of his ELE benefits.

### 1.   Krum's ELE breach-of-contract claims.

In the 90 days after his residence became uninhabitable, Krum made nine different requests for ELE replacement housing expenses—and Chubb Adjusters denied each one. Each of those denials constituted a breach of GNIC's obligations to provide ELE coverage under the terms of the policy.

And none of the district court's reasons for excusing those breaches withstands scrutiny.

> a. *The policy does not require Krum to "incur" out-of-pocket ELE replacement-housing costs before GNIC is obliged to provide benefits.*

The district court first concluded that GNIC was not obliged to provide Krum with ELE replacement-housing benefits on any of the nine occasions he requested them, and Krum had no recourse for any of GNIC's nine denials, because Krum never "incurred" the costs associated with them. (App.Vol.20 at 3218). But GNIC was not free to deny Krum's ELE replacement housing costs simply because it did so *before* he incurred them.

This is apparent from the structure of the policy's ELE provision, which *only sometimes* requires insureds to "incur" ELE costs before GNIC must provide ELE benefits. When insureds are displaced from their homes as the result of "constructing" a house or making "additions, alterations or renovations," then the insured must pay out of pocket and the policy's ELE coverage is expressly limited to the extra living expenses actually "incurred." (App.Vol.6 at 1562). But no such limitation appears in the ELE provision protecting those who are displaced from their homes because they have become "uninhabitable" for other reasons—such as a flood or other sudden

peril. (App.Vol.6 at 1561-1562). These insureds are entitled to obtain "the reasonable increase in [their] normal living expenses" even before those costs are "incurred." (*Id.*). That distinction among insureds makes sense: A person who is building or remodeling a house can budget to cover extra housing costs and simply request reimbursement. But a person dispossessed by catastrophic loss is "particularly vulnerable because of the injury or loss," *Savio*, 706 P.2d at 1273, and should not be forced to bear *additional* loss by incurring out-of-pocket expenses in the middle of a tragedy. That is why the policy did not require Krum to pay for replacement housing himself before GNIC became obliged to provide him with ELE replacing housing benefits.

This interpretation of the policy is consistent with how GNIC's own representatives interpreted it. GNIC approved Krum's additional food expenses and dog-boarding costs in advance—*before* they were incurred. (App.Vol.6 at 1475, 1483). According to Tommy Le, the Senior Chubb adjuster who initially handled Krum's claim, that is because the policy does not treat ELE as an "incurred cost" for those displaced from an uninhabitable home. (App.Vol.11 at 2179-2180, 2187 [146:6-147:25, 148:23-149:10]). That is also why Le asked Krum to go into a "temporary" hotel and GNIC would "take over billing." (App.Vol.17 at 2814-2815).

Steven Magnotta, Chubb's "Executive General Adjuster" assigned to the Krum claim explained that this was the reason behind the company's practice of getting approval "in advance" for ELE expenditures. (App.Vol.20 at 3252). "When a house is [un]inhabitable … we won't have the insured have any out-of-pocket costs." (App.Vol.4 at 856, 919 [254:13-256:2]). Rather, once an insured proposes replacement housing that Chubb "agree[s]" is acceptable, then Chubb "would … fund the necessary monies … so that there's no out-of-pocket." (App.Vol.4 at 919 [254:1-255:5]). That arrangement ensures that the insured has proposed a "a suitable property" before GNIC becomes obliged to pay for it. Accordingly, GNIC's approval process constitutes a recognition of the fact that it—not the insured—bears the responsibility for incurring ELE housing costs.

That makes this situation very different from the case that the district court relied upon, *KAT Construction Management v. Safeco Ins. Co. of Am.*, *No. 19-cv-02981-RM-KLM*, 2022 WL 136905 (D. Colo. Jan. 14, 2022), which involved no "similar" policy. (App.Vol.20 at 3218). The policy in *KAT* obliged the insurance company to pay only the "amount actually and necessarily incurred" to fix a roof, and therefore did not cover a person who simply elected not to repair the roof. 2022 WL 136905, at *4. Because Krum's policy contains

different language GNIC was not free to deny Krum's requests for ELE benefits simply because he had not yet incurred them.

      *b.     Nothing required Krum to incur ELE charges after they had been denied in order to sue for breach of contract.*

In any event, regardless of whether the policy required Krum to incur ELE charges before being entitled to obtain them, nothing required Krum to incur ELE charges after GNIC *denied* them in order to maintain a breach-of-contract claim. By that logic, Krum would be required to *ignore* GNIC's denials and rent one of the properties anyway, potentially incurring millions of dollars, simply to maintain a breach-of-contract claim for benefits GNIC had already indicated it would not pay. All while he had been displaced from his home.

Contract law does not require such needless formalities. Each instance in which GNIC denied ELE requests to which Krum was entitled constitutes an "anticipatory repudiation" of its obligations under the policy—*i.e.*, a "[r]epudiation of a contractual duty before the time for performance." *Repudiation*, BLACK'S LAW DICTIONARY (11th ed. 2019). That repudiation entitled Krum to sue for breach of contract to obtain the "benefit" of his contractual "bargain"—the ELE benefits that GNIC *should* have provided

but did not. *Chaparral Res., Inc. v. Monsanto Co.*, 849 F.2d 1286, 1289, 1290, 1291 (10th Cir. 1988) (citing RESTATEMENT (SECOND) OF CONTRACTS §344(a) (1981)). Accordingly, having imposed a process requiring advance approval of ELE expenses, GNIC cannot rely on its advance *disapproval* of those expenses to escape liability.

c. *None of the ELE denials were justified.*

Indeed, even the district court ultimately recognized that Krum was not required to incur ELE expenses that GNIC had explicitly denied. It simply concluded that Krum failed to demonstrate "that these requests were *improperly* denied." (*Id.*) (emphasis added). That too was incorrect. GNIC offered *no* reason for denying Krum's pre-January 17 ELE replacement-housing requests. It simply put Krum off with claims that it was "currently reviewing" them, knowing that with these delays, Krum's option to rent the requested property during the requested period would be lost, some of the properties would be rented, and the time Krum spent finding and negotiating these options would be wasted. Those delays were therefore effectively denials—made without any legitimate justification. Each was denied "improperly."

Krum has also provided numerous reasons why each of GNIC's post-January 17 denials were improper. Krum has raised genuine questions whether the voluminous information Chubb Adjusters demanded to prove Krum's "usual vacation occupancy" of the property was required under the policy; whether (and by what point) Krum had provided sufficient evidence to satisfy that standard, and whether some of the information Krum provided (like his flight records) was relevant in determining his visits to the property. Accordingly, Krum's breach of contract claim should not have been dismissed.

> d.  *A live dispute exists over whether Krum's ELE coverage was subject to a 60-day limitation, and Krum's interpretation is correct.*

Finally, the district court erred in concluding that the dispute over whether the "policy provides more than sixty days of ELE coverage" is "not ripe." (App.Vol.20 at 3219). Despite what GNIC contends, Krum *did* present evidence that he was denied "ELE benefits beyond what he received" because of the policy's supposed 60-day limitation. (*Id.*). GNIC explicitly refused to provide Krum more than 60 days of ELE food and dog-boarding expenses, stating that it "would only reimburse" those expenses "for 60 days." (App.Vol.14 at 2395, 2435). Krum's breach-of-contract claim challenges those refusals. (App.Vol.1 at118, 134-135). Accordingly, at the very least, there is a

live dispute over GNIC's refusal to provide Krum more than 60 days of food and dog boarding.

That refusal was unjustified because the policy contains no 60-day limitation on recoverable ELE expenses for those whose homes are rendered uninhabitable by sudden catastrophic loss. Rather, the text of the ELE provision makes clear that the 60-day limitation applies only to ELE expenses incurred during construction. That provision reads:

> If a covered loss makes your house or other permanent structure uninhabitable during your usual vacation occupancy, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living.
>
> ***
>
> We cover these increases for the reasonable amount of time required to restore your house or other permanent structure to a habitable condition, or if you or members of your household permanently relocate, the shortest amount of time required to settle elsewhere. **However**, if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, we only cover the increase in your normal living expenses incurred by you for the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss. **We cover *these* extra living expenses for up to 60 days, even if the policy period ends during that time**.

(App.Vol.6 at 1538, 1561-1562 ) (emphasis added).

The highlighted term "however" effectively divides the ELE provision into two separate clauses: one for those whose homes are rendered uninhabitable for *any* reason; another for those whose homes are rendered uninhabitable because of construction. The "however" exempts the latter class from the former, creating the ELE provision's division between those who are displaced from their homes by sudden perils like flooding or storms, and those who are displaced because they chose to build or renovate their homes. The 60-day limitation appears at the end of the second clause pertaining to construction, indicating that it flows with, and modifies, only that second clause. And that conclusion is only reinforced by the fact that the clause does not purport to modify *all* of the coverage for extra living expenses covered by the ELE provision, but only "these" extra living expenses—referring to the ELE expenses incurred during construction mentioned in the immediately preceding sentence.

That interpretation of the ELE provision again makes sense because home-builders can be expected to anticipate and bear extra living expenses longer than those who are displaced by emergency. And because Krum clearly falls into the latter camp, the policy language plainly reads (or at least can be reasonably construed) as exempting his ELE claims from the 60-day time

limitation. The district court's dismissal of Krum's ELE breach-of-contract claim must be reversed for this additional reason.

### 2. Krum's ELE bad-faith claim.

The district court likewise erred in dismissing Krum's ELE-related bad-faith claim, because, despite what the district court concluded, there is ample evidence that the Chubb Adjusters and GNIC acted unreasonably in denying Krum's ELE claims. (App.Vol.20 at 3221).

An insurer must refrain from "act[ing] unreasonably" in making coverage determinations, *Sandoval*, 952 F.3d at 1236, and offer a "reasonable basis" for refusing to pay benefits, Colo. Rev. Stat. §10-3-1115(1)(a) & (2). And, as the expert said in *Peden* (and this Court approved), "[a]n insurer, in conducting its investigation, should look for facts which support coverage with at least as much diligence as the insurer expends in any attempt to limit or deny coverage." 841 F.3d at 891 (internal quotation marks omitted).

But the evidence suggests GNIC's reasons for denying each of Krum's nine ELE replacement-housing requests were anything but reasonable, and its investigation of Krum's ELE claim sought only facts to *deny* coverage, not provide it. That evidence includes GNIC's refusal to give Krum *any* reason for denying his pre-January 17 requests or provide any reason why it needed

additional time to "review" those requests. As for the post-January 17 denials, there are legitimate questions (1) whether GNIC could demand that Krum prove his "usual vacation" occupancy in order to obtain ELE benefits after indicating those benefits had already been approved; (2) why Chubb Adjusters then demanded that Krum provide voluminous information to establish how often he traveled to his own home, without pointing to anything in the policy requiring it; and (3) whether GNIC demonstrated "reckless indifference to facts or to proofs submitted by the insured," *Savio*, 706 P.2d at 1275, in refusing to accept the very flight records it demanded and baselessly rejecting Krum's assurances that those records were restricted to visits to his property. This evidence led Plaintiff's expert Robert Landow to conclude that "no reasonable basis existed for [GNIC] and Chubb unreasonably delaying and denying Mr. Krum's [ELE] coverage requests and claims." (App.Vol.14 at 2395, 2455). And for that reason alone, summary judgment should have been denied on Krum's bad-faith claim relating to the denial of his ELE benefits.

But despite what the district court held, Krum's bad-faith claim is not restricted to whether GNIC's refusal "to pay additional ELE benefits was unreasonable." (App.Vol.20 at 3221). An insurer also acts in bad faith when it unreasonably "delay[s]" payment of covered benefits. (*Id.*, citing Colo. Rev.

Stat. §10-3-1115(1)(a)). And the record is replete with evidence of GNIC's unreasonable delays, including putting off Krum's ELE replacement-housing requests in the first 3 weeks of his loss when he needed housing most, waiting those 3 weeks before starting to establish his "usual vacation occupancy," and then taking 3 full *months* to complete that process. Landow concluded that Krum had demonstrated his "usual vacation occupancy" of the property "on numerous occasions" "over an approximately two-month period of time" "beyond any reasonable standard," long before the Chubb Adjusters and GNIC actually made that determination. (App.Vol.14 at 2395, 2453-2454). GNIC's delay in making that determination caused Krum to lose nine of his requested ELE rental options.

An insurer must also diligently investigate claims, including by "promptly and effectively communicat[ing] with anyone it was reasonably aware had ... information pertaining to the handling of plaintiffs' claim." *Dunn v. Am. Family Ins.*, 251 P.3d 1232, 1238 (Colo. App. 2010). But Great Northern did no investigation to satisfy its supposed doubts about whether Krum had adequately demonstrated his "usual vacation occupancy" of the property— including by contacting Krum's alarm company, examining gate code data within its possession, or contacting Beaver Creek Public Safety to corroborate

Krum's visits home, examining Krum's extensive and detailed flight records, or accepting Krum's offer to be examined on about them under oath. Those failures further delayed the determination of Krum's "usual vacation occupancy" of the property.

Last, but not least, an insurer has the obligation to deal "honestly and fairly" with its insured and do nothing to unfairly deprive them of the "full benefits" of the insurance contract. *Savio*, 706 P.2d at 1272-73. But as Landow explained, Chubb's Adjusters made multiple "misleading representations" to Krum throughout the process of evaluating his ELE claim, and those misrepresentations also constituted "breach of [the] duty of good faith and fair dealing." (App.Vol.14 at 2395, 2454). For all these reasons, Krum's evidence raises genuine issues of material fact on Krum's bad-faith claim relating to the denial of his ELE benefits, and the district court's decision dismissing that claim must therefore be reversed.

### C. The district court also made multiple errors in relation to Krum's THAS claim.

#### 1. The district court erred in dismissing Krum's bad-faith claim relating to the THAS damages.

The district court also erred in dismissing Krum's bad-faith claim relating to the dispute over the THAS damages. Despite what the district court concluded, GNIC's obligation to treat Krum fairly and honestly did not

end the moment Krum invoked the appraisal process—or excuse its bad-faith behavior occurring before the appraisal began. (*See* App.Vol.20 at 3222). In concluding otherwise, the court relied upon *Sanderson v. American Family Mutual Insurance Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010). But *Sanderson* conclusively negates the idea that an insurer's duty of good faith is ever suspended completely, concluding that it "continues unabated during the life of an insurer-insured relationship, including through a lawsuit or arbitration between the insured and the insurer." 251 P.3d at 1217. *Sanderson* suggests instead that only *one* of an insurer's duties is suspended during an arbitration or similar appraisal processes: the duty to "negotiate," because the insurer can wait until the value of that claim is determined through the "adversarial" process before undertaking further efforts to negotiate a settlement. *Id.*

But none of Krum's claims concern GNIC's duty to negotiate a settlement. Instead, they center on GNIC's duty to properly investigate Krum's THAS claim. And the appraisal award itself is ultimately the best evidence that the Chubb Adjusters and GNIC violated that duty. After all, Krum had to invoke appraisal only because GNIC's initial damage assessments were unreasonably low and far below Krum's own estimate. That fact was confirmed by the appraisal award itself, which was thirty times the

initial loss assessment and ten times GNIC's final loss assessment. (App.Vol.2 at 451; Vol.8 at 1981). This Court has previously held that a far less "significant disparity" between an insurer's initial estimate and an appraiser's award constituted evidence of bad faith, "rais[ing] an inference" that the insurer "was less than diligent in investigating Plaintiff's damages and did not 'fairly evaluate the claim.'" *Blakely v. USAA Cas. Ins. Co.*, 500 Fed. App'x 734, 737, 740 (10th Cir. 2012) (applying Utah law). Indeed, Judge Moore himself previously held that the disparity between an insurer's "initial payment[] of roughly $15,000 on a claim" and an appraisal award of $330,000 suggested that the insurer "acted unreasonably or that its investigation was inadequate." *Por Boy Stores, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-CV-00990-RM-MEH, 2022 WL 2064930, at *5 (D. Colo. June 8, 2022) (Moore, J.). But Judge Moore inexplicably failed to follow the logic of *Por Boy Stores* in this case.

Furthermore, GNIC's failure to investigate Krum's THAS claim is only the beginning of the dilatory, dishonest, and unethical conduct by Chubb Adjusters during the process of determining Krum's THAS losses. That conduct includes GNIC's unreasonable 4-month delay in preparing its initial loss assessment for the THAS, its subsequent 11-month effort to derail the appraisal process, and the entire delay after GNIC's investigation, and the

entire period after the Chubb Adjusters and retained experts had finished all of their reports on the THAS loss, and before paying Krum's claim. (App.Vol.7 at 1865, 1871).

Through that delay, GNIC clearly hoped to use its superior "resources" as leverage to wait out Krum, "with an eye toward settling for a lesser amount than that due under the policy," *Savio*, 706 P.2d at 1273 (internal quotation omitted). That is clearly demonstrated by the $564,000 settlement offer and "Agreement in lieu of Appraisal Process" that Chubb Adjuster Magnotta made (and then later denied making under oath) half-way through its own evaluation of Krum's THAS claim—an offer that was less than half of what the appraisal panel would eventually award. (App.Vol.14 at 2395, 2444-2448). There is evidence that GNIC made that settlement offer long before the district court appointed the neutral appraiser—and requested authority from superiors to offer more—because they feared the district court would "most likely appoint a subject matter" expert as the neutral appraiser, having an "adverse effect on the appraisal outcome" from GNIC's perspective. (App.Vol.12 at 2231-2232).

Krum's evidence of bad-faith conduct also includes GNIC's refusal (prior to the appraisal award) to provide Krum $250,000 for "low-voltage wiring" that

it knew he was entitled to recover, as well as its refusal to disclose the conflicts of interests and *ex parte* communications of its proposed neutral third appraiser. This evidence convinced Expert Landow that Chubb and GNIC were "plac[ing] their self-serving financial interest above Mr. Krum's well[]being during its investigation of Mr. Krum's THAS," presenting evidence of bad faith—evidence that Krum should be entitled to present to a jury. (App.Vol.14 at 2395-2396, 2455). The district court's dismissal of this claim must be reversed.

### 2. The district court also erred in denying Krum discovery related to his bad-faith claim related to the THAS.

Not only did the district court err in dismissing Krum's bad-faith claim relating to the THAS on the merits, but the court also erred in affirming the magistrate judge's order denying Krum the opportunity to depose Chubb Senior Vice President Joseph R. Smith concerning his "unique personal knowledge" of the THAS claim. During document discovery in this case, Krum learned that Smith was directly and significantly involved in Krum's THAS claim. (App.Vol.9 at 2040, 2056-2057). Krum obtained documents demonstrating that Chubb made the $564,000 offer to settle Krum's THAS claim to escape the appraisal process, when the Chubb representative who

made the offer, Steven Magnotta, sought direct approval from Smith to go higher—even though Smith was not his immediate supervisor. (*Id.*)

This evidence of Smith's direct involvement in Krum's claim contradicted GNIC's initial disclosures, in which GNIC did not disclose Smith as a person with knowledge of Krum's claims. (App.Vol.5 at 1401, 1412-1413; Vol.9 at 2040, 2042). It also contradicted Magnotta's deposition testimony in which he testified that he never made the $564,000 offer to Krum. (App.Vol.10 at 2146, 2151 182:11-184:16]).

Krum sought to depose Smith to have him explain these discrepancies and to explore the extent of Smith's direct involvement in his THAS claim. But GNIC sought to quash the deposition, insisting erroneously that Smith had "zero substantive involvement" in Krum's claim "other than being Magnotta's supervisor and occasionally being copied on emails"—even though Magnotta had bypassed his actual supervisor and inserted Smith directly into the process of negotiating Krum's THAS claim. GNIC also maintained that as one of its "high level executives," Smith could not be deposed absent a showing that he possessed "unique personal knowledge" regarding Krum's THAS claim. (App.Vol.4 at 844 847-848, 851).

In January 2023, the magistrate judge refused to allow the deposition, instead allowing Krum to propound a single interrogatory to Smith which must be answered within 14 days. (App.Vol.5 at 1376). On January 21, 2023, Krum propounded this interrogatory to Smith, asking who gave Magnotta the "authority" to make the $564,000 offer to Krum, expecting Smith to admit that *he* gave Magnotta the authority—giving him unique personal knowledge about the settlement. (App.Vol.5 at 1401, 1407-1413; Vol.9 at 2040, 2052-2058). Smith did not respond until February 10—more than six days late. (App.Vol.5 at 1398-1399). And his answer was both revealing and incomplete. He admitted that the offer was made—making him the only GNIC representative willing to admit to the July 30, 2020 settlement offer's existence, but he refused to disclose that his own approval was necessary before Magnotta could make a settlement offer to Krum—offering only "Great Northern Insurance Company" provided that authority (App.Vol.5 at 1407-1413).

Krum believed this gave Smith unique personal knowledge about the THAS claim that was not disclosed in the interrogatory response, but, the magistrate judge refused to allow Smith's deposition, concluding that even though Smith's tardy response to the interrogatory did not arrive until "after

the discovery period had closed," good cause did not exist to amend the scheduling order and allow the deposition. (App.Vol.5 at 1399-1400).

That refusal constitutes an abuse of discretion. Krum was forced to request Smith's deposition in February 2023 after the discovery deadline only because of Smith's tardy and inadequate interrogatory response and his refusal to comply with Plaintiff's Notice of Deposition of October 13, 2022. Krum only propounded the interrogatory in January 2023 because that was when the magistrate judge instructed him to do so. And while the court accused Krum of not beginning the process of seeking discovery from Smith sooner—noting that discovery began in "June 2021" (*Id.*)—this ignores that Krum had originally noticed Smith's deposition in early October 2022 (App.Vol.9 at 2069-2076).

GNIC then refused to produce Smith for deposition, leading directly to GNIC's December 5 request for a protective order (App.Vol.4 at 844-855) and the magistrate judge's January 2023 order granting it. Krum quite literally could not have requested Smith's deposition much sooner. Krum therefore cannot be faulted for seeking that deposition too late. It was an abuse of discretion for the magistrate to conclude otherwise, and error for the district

court to affirm that conclusion. Accordingly, when the Court remands this case, it should order that Krum is entitled to depose Smith.

## III. The district court erred in dismissing Krum's claims against the Brokers.

Finally, Krum's negligence, breach-of-contract, and breach-of-fiduciary-duty claims against the Brokers should be reinstated. The district court dismissed all of Krum's claims against the Brokers on causation grounds, postulating that Krum's supposed inability to establish that he was "entitled to any benefits that exceed the policy limits" made it impossible for him to prove that he would have "'been able to obtain a better deal'" in a policy with "unlimited" FRV and ELE "coverage." (App.Vol.20 at 3224-3226) (quoting *Gibbons v. Ludlow*, 304 P.3d 239, 245 (Colo. 2013)). But that conclusion is wrong three different ways.

First, the policy's "limits" on coverage, like its 15-day cap on FRV coverage and the supposed 60-day cap on his ELE benefits, *do* come into play in this case. After all, Krum was denied coverage for more than 60 days of food expenses under the ELE provision's 60-day cap. Krum certainly does not believe that this cap should apply to his ELE claims, but even if he is proven wrong, he should be entitled to challenge whether it was improper and against his specific instructions for the Brokers to place him in a policy with those FRV

and ELE caps. No "maximum" and "unlimited" policy limits FRV coverage to 15 days or ELE coverage to 60 days. Krum's initial Chartis policy contained no such limits. (App.Vol.15 at 2622, 2630-2361). The Brokers therefore violated their contractual and common-law duties to Krum by placing him in a policy containing those limits. This is especially true with regard to the FRV coverage because Krum told the Brokers before switching to the Chubb policy that he rented out the property for 43 days the first year he owned it— indicating he needed more than 15 days of FRV coverage. (App.Vol.14 at 2385, 2388-2389; Vol.17 at 2800-2802).

But the policy's "limits" on coverage are only part of the problem. There are also problems with the policy's *preconditions* on FRV and ELE coverage—including the supposed condition precedent requiring Krum to establish he "usually rented the property" in the FRV provision and the requirement that he demonstrate his "usual vacation occupancy" to obtain ELE coverage.

These preconditions should have never been included in any "unlimited" FRV and ELE policy like the Chartis policy. After all, no "unlimited" FRV policy would contain a condition precedent resulting in the insured having *no* FRV coverage. And indeed, the coverage provided by the Chartis policy, which

the Brokers promised to match, contained no such condition precedent. (App.Vol.15 at 2622, 2630-2631). Similarly, no "unlimited" ELE policy would have required Krum to demonstrate his "usual vacation occupancy" of the property—either as a condition to obtaining coverage or as a limit on the extent of coverage. *All* of his lost "occupancy" of the property would have been covered. For that reason, the district court erred in concluding that the Brokers did no wrong by placing Krum in a "Vacation Home Policy" policy rather than a true homeowner's policy (App.Vol.20 at 3224-3226)—because a true homeowner's policy like Krum's Chartis policy does not require insureds to demonstrate the amount of time they spend at home.

Accordingly, if the Brokers had done as Krum had instructed and obtained *unlimited* FRV and ELE coverage similar to the coverage provided under his old Chartis policy, then he would not have been placed in a policy with these conditions and his insurer would have had no reason to deny coverage. That would have definitely been a "better deal" and a more favorable result for Krum. *Gibbons*, 304 P.3d at 245. The Brokers' negligent acts and omissions caused significant harm and financial loss to Krum.

But in any event, if the Court reverses the district court's denial of Krum's FRV and ELE claims, then there is no question that the policy's

"limits" should come into play, and Krum should be able to challenge whether the Brokers acted properly—and in compliance with their contractual and common-law duties to provide him appropriate insurance coverage—by placing him in a policy with those limits. For all these reasons, the district court's dismissal of Krum's claims against the brokers must also be reversed.

## CONCLUSION

For all the reasons above, the Court should reverse the judgment of the district court in this case and vacate the order denying Krum's request to depose Joseph R. Smith.

Respectfully submitted,

*J. Carl Cecere*

Bradley A. Levin
Levin Sitcoff Waneka
455 Sherman St., Ste. 490
Denver. CO 80203
tel: 303.575.9390
brad@lsw-legal.com

Mark Jay Krum
Mark Jay Krum, Esq.
NY State Bar No. 2432243
P.O. Box 6186
Avon, CO 81620
tel: 215.605.8200
MarkJayKrum@aol.com

J. Carl Cecere
State Bar No. 24050397
CECERE PC
6035 McCommas Blvd.
Dallas, Texas 75206
tel: 469.600.9455
ccecere@cecerepc.com

*Counsel for Appellant*
*Mark Jay Krum*

## REQUEST FOR ORAL ARGUMENT

Appellant Mark Jay Krum requests oral argument. The record in this case is extensive—with an appendix numbering 20 volumes. The legal questions in this case are also complex, concerning breaches of multiple provisions in Krum's policy and multiple bad-faith claims associated with three types of coverage. And the Court's answers to these questions will have consequences for many homeowners. Krum therefore believes that oral argument will be beneficial to the Court's resolution of this case.

# CERTIFICATE OF COMPLIANCE

*Certificate of Compliance with Type-Volume Limitation,*
*Typeface Requirements, and Type Style Requirements*

1. This brief complies with the type-volume limits in Federal Rule of Appellate Procedure 32(a)(1) because this brief contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Expanded BT font.

November 29, 2023                         */s/ J. Carl Cecere*

                                          J. Carl Cecere

                                          Attorney for Appellant
                                          Mark Jay Krum
                                          Cecere PC
                                          6035 McCommas Blvd.
                                          Dallas, TX  75206
                                          ccecere@cecerepc.com
                                          tel: 469.600.9455

## CERTIFICATE OF DIGITAL SUBMISSION

With respect to this brief, all required privacy redactions have been made; the hard copies submitted to the clerk are exact copies of the ECF submission; the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Word 2016, and according to the program is free of viruses.

November 29, 2023

/s/ *J. Carl Cecere*

J. Carl Cecere

Attorney for Appellant
Mark Jay Krum
Cecere PC
6035 McCommas Blvd.
Dallas, TX  75206
ccecere@cecerepc.com
tel: 469.600.9455

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2023, I electronically filed the Final Form Brief for Appellant Mark Jay Krum with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF.

November 29, 2023

*/s/ J. Carl Cecere*

J. Carl Cecere

Attorney for Appellant
Mark Jay Krum
Cecere PC
6035 McCommas Blvd.
Dallas, TX 75206
ccecere@cecerepc.com
tel: 469.600.9455

**ADDENDUM**

# ADDENDUM

Order on Discovery
Dispute (02/27/2023)
.................................................................tab 1          A1398

Order
(08/15/2023)
.................................................................tab 2          A3005

Amended Final Judgment
(09/23/2023)
............................................................. tab 3          A3055

i

TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Gordon P. Gallagher, United States Magistrate Judge

Civil Case No. 20-cv-03616-RM-GPG

MARK JAY KRUM,

       Plaintiff,

v.

CHUBB LIMITED;
GREAT NORTHERN INSURANCE COMPANY;
CELIA SANTANA,
DALE KRUPOWICZ, and
PERSONAL RISK MANAGEMENT SOLUTIONS, LLC

       Defendants.

---

ORDER ON DISCOVERY DISPUTE

---

This matter is before the Court for a discovery dispute hearing pursuant to the undersigned's Discovery Dispute Procedures.[1]   The parties tendered a dispute chart to the Court by email on February 22, 2023, and the Court attaches that chart to this Order as an exhibit.  Four issues are presented and the Court resolves them as follows.

**Issue #1: Mr. Hamilton's signing of his interrogatory response.**

The Defendants have tendered Mr. Hamilton's answers to the Plaintiff's interrogatories in an unsigned form several weeks ago, but have yet to produce a copy signed by Mr. Hamilton. This issue was raised to the Court previously in a discovery dispute on February 1, 2023, and the Defendants indicated that they would produce a set of answers signed by Mr. Hamilton promptly.

There is no reason to indulge in further disputes on this point.  The Defendants' counsel represents that Mr. Hamilton has orally attested to the accuracy of the tendered interrogatory answers.  In the absence of Mr. Hamilton's signature attesting to the accuracy of those answers

---

[1] *See* http://www.cod.uscourts.gov/Portals/0/Documents/Judges/MAG/Discovery_Dispute_Procedures.pdf

under penalty of perjury after all this time, the Court will deem him to have made such attestation as of the date of this Order.  Thus, the answers to interrogatories by Mr. Hamilton already provided to the Plaintiff are now deemed signed by Mr. Hamilton under penalty of perjury under Fed. R. Civ. P. 33(b)(5) for all further purposes in this case.

### Issue #2: Mr. Chapin's interrogatory response

Pursuant to this Court's January 10, 2023 Order (D. 220), Mr. Krum was granted leave to serve a single interrogatory inquiring about a conversation that Mr. Chapin and others participated in or about February 2020.  The interrogatory Mr. Krum tendered to Mr. Chapin seeks substantive answers about policy definitions and does not inquire about any of Mr. Chapin's recollections of the February 2020 conversation or about any statements Mr. Chapin may have made during that conversation.  The Defendants represent that, if asked about the conversation, Mr. Chapin's answer would be that he recalls participating in a discussion at that time on a specific topic with specific individuals, but that he has no specific recollection about the actual contents of the discussion.

Mr. Krum has already had the opportunity to conduct a Rule 30(b)(6) deposition of the Defendants to ascertain their position on the definition of the policy terms that Mr. Krum seeks to ask Mr. Chapin about.  The Court's allowance of an interrogatory to be served on Mr. Chapin was not intended to allow Mr. Krum another bite at the Rule 30(b)(6) apple, but rather, an opportunity to discover what, if anything, Mr. Chapin might recall about the contents of the February 2020 conversation.  Accordingly, the Court denies Mr. Krum's request to compel Mr. Chapin to respond to the interrogatory Mr. Krum tendered.  In the interests of avoiding further disputes on this issue, for purposes of cross-examination at trial, the Court will deem Mr. Chapin to have adopted the statement asserted on his behalf in the Discovery Dispute Chart: that "he has no specific recollection about the telephone conference that took place in January or February 2020 beyond the fact that ALE coverage under the Policy was discussed and the conversation may have included Tommy Le, Matthew Witcher and Corey Everett. Mr. Chapin recalls, generally, that the conversation related to the FRV coverage under the policy which includes the term 'usually rents to others; but has no recollection, specifically, what was discussed."

### Issue #3: Timeliness of Mr. Smith's interrogatory response

The Court's January 10, 2023 Order permitted Mr. Krum the opportunity to serve an interrogatory on certain individuals, including Mr. Smith, and directed that those individuals respond within 14 days.  Mr. Krum served his interrogatory on Mr. Smith on or about January 21, 2023, and Mr. Smith responded on February 10, 2023, approximately 20 days later.

Assuming Mr. Smith's response was indeed untimely, Mr. Krum has not identified any prejudice he has suffered as a result of that untimeliness.  Accordingly, the Court finds that no relief is necessary to address the issue.

### Issue #4:  Mr. Smith's substantive interrogatory response

Mr. Krum tendered an interrogatory to Mr. Smith that reads, in pertinent part, "Identify the authority under which [Chubb adjuster Steven Magnotta] acted when he" took certain actions. Mr. Smith responded that Mr. Magnotta "received the authority to [perform the actions] from Defendant Great Northern Insurance Company." Mr. Krum contends that this response is inconsistent with evidence in the record that suggests that Great Northern Insurance Company never gave Mr. Magnotta such authorization.

The Discovery Dispute Chart indicates that Mr. Krum requests that the Court "compel[ Mr. Smith] to answer the question propounded by the Plaintiff truthfully and completely." Mr. Smith has fully answered the interrogatory posed to him. The fact that Mr. Krum disbelieves that answer is not a basis for further relief. It is not unusual for different witnesses in a case to give conflicting testimony on a given point, and Mr. Krum is free at trial to attempt to impeach Mr. Smith based on the discrepancies between his testimony and the testimony of other witnesses.

To the extent Mr. Krum instead wishes to depose Mr. Smith to address the inconsistencies, the Court denies that request. Pursuant to the Scheduling Order (D. 213), the discovery period closed on February 3, 2023. Mr. Krum has not articulated good cause under Fed. R. Civ. P. 16 to amend the Scheduling Order to permit him to request to depose Mr. Smith, nor would the Court find that good cause exists under the circumstances. Although Mr. Krum served his interrogatory on Mr. Smith on January 21, 2023 and Mr. Smith responded on February 10, 2023, after the discovery period had closed, the record reflects that the parties have been engaged in discovery since as early as June 2021 (D. 108). To say that discovery in this case was dysfunctional is an understatement, and both sides bear considerable responsibility for that situation. Whether Mr. Krum misdirected his discovery efforts and failed to obtain critical information until it was too late in the discovery process to adequately corroborate or challenge it is not for this Court to say. It is sufficient to observe that the parties have had ample time to fully discover the relevant evidence in this case and it is now time for the litigation to proceed to post-discovery phases. Accordingly, the Court denies Mr. Krum's request for additional relief relating to Mr. Smith's interrogatory response.

For the foregoing reasons, the Court denies Mr. Krum's request for relief on the issues raised in the Discovery Dispute Chart. Moreover, the discovery deadline in the Scheduling Order having passed, the Court certifies that discovery in this case is now complete.

Dated at Grand Junction, Colorado this 27th day of February, 2023.

_____
Gordon P. Gallagher
United States Magistrate Judge

**A1400**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03616-RM-GPG

MARK JAY KRUM

      Plaintiff,

v.

CHUBB LIMITED,
GREAT NORTHERN INSURANCE CO.,
CELIA SANTANA, DALE
KRUPOWICZ, and PRMS

      Defendants.

---

**JOINT DISCOVERY DISPUTE CHART REGARDING INTERROGATORY
RESPONSES FROM HAMILTON, SMITH AND CHAPIN PURSUANT TO COURT'S
ORDER OF JAN. 10, 2023 AT ECF DOC. 220 AND COURT'S
ORDER OF FEB. 2, 2023 AT ECF DOC. 233**

---

| Issue | Moving Position of Plaintiff | Defendant's Position |
|---|---|---|
| Whether Mr. Hamilton is required to sign and verify his interrogatory answer of Jan. 27, 2023. | Pursuant to Fed. R. Civ. P. 33(b)(5) "The person who makes the answers must sign them . . . ." <br><br> Mr. Hamilton's Response by Defendant GNIC is neither signed nor verified by Mr. Hamilton. <br><br> This issue was a subject of a joint discovery dispute chart and hearing and hearing held before this Court on February 1, 2023. *See* ECF Doc. 233.  At that time, Plaintiff believed counsel for GNIC represented to Plaintiff that he should be able to obtain Mr. Hamilton's verification within a week which was acceptable to | GNIC does not dispute that Rule 33(b)(5) requires interrogatory responses to be signed. <br><br> Despite Plaintiff's assertion to the contrary, the undersigned never represented that either he or GNIC could secure a verification from Mr. Hamilton "within a week." Rather, the undersigned has repeatedly advised Plaintiff that a verification from Mr. Hamilton will be provided upon receipt. <br><br> After securing Mr. Hamilton's consent to serving his response to the interrogatory, the undersigned |

| | | |
|---|---|---|
| | Plaintiff. It is now four weeks (since 1/27/23) post service of Mr. Hamilton's interrogatory response and 23 days since counsel for Defendant Great Northern Insurance Company ("GNIC" or "Great Northern") represented he would promptly obtain the Hamilton verification. Over the last three weeks Plaintiff has requested from defense counsel the Hamilton verification on multiple occasions. Defense counsel has acknowledged they continue to represent Mr. Hamilton.<br><br>Plaintiff now requests this Court to Order Mr. Hamilton's attorneys to provide a signed verification by their client Mr. Hamilton to Plaintiff by COB on March 3, 2023. | has repeatedly requested that Mr. Hamilton provide a signed verification. To date, no such verification has been provided. The undersigned will continue to request that Mr. Hamilton provide a verification.<br><br>This Court should note that Mr. Hamilton is no longer an employee of GNIC and therefore GNIC has no control over him. Mr. Hamilton also lives outside this Court's jurisdiction. |
| Whether Defendant GNIC and its client representative Kurt Chapin should be compelled to Fully Answer Plaintiff's Interrogatory No. Two And that Plaintiff then be Permitted to Depose Mr. Chapin. | Pursuant to this Court's Order at ECF Doc. 233, Plaintiff served a "Second Interrogatory" directed to GNIC Representative Chapin on February 3, 2023. A copy of Plaintiff's Second Interrogatory to Kurt Chapin is attached as **Ex. 1**. A copy of the February 10, 2023 Chapin Response is attached as **Ex. 2**.<br><br>Plaintiff's Second Interrogatory to Mr. Chapin stated: "Identify and define the meaning of the Chubb/ Great Northern Insurance Policy term 'usually rent to others' as such term applied/applies to triggering the FRV coverage in the Insurance Policy concerning the Insured Event, the BC Property and Mr. Krum." | Based upon Mr. Chapin's original interrogatory response stating he had a "general recollection" of a telephone conference in January or February of 2020, this Court permitted Plaintiff to serve a second interrogatory "inquiring as to what Mr. Chapin's recollection of that telephone conference might be." Hearing Tr. (2/1/23) at 20:13-14. The purpose of allowing this second interrogatory was to assist the Court in determining whether Mr. Chapin had any personal, unique knowledge that may give rise for the need to depose him. *See id.* at 20:15-17 ("Depending upon the answer of that interrogatory, that may or may not open the door to a deposition of Mr. Chapin, but it does not yet."). |

Plaintiff's Second Interrogatory to Chapin defined the following terms: (i) "Identify" on page three; (ii) "Trigger" and/or "Triggering" on page eight; (iii) "Define" on page eight; (iv) Insurance Policy" on page five; (v) "FRV Benefits" on page six; and (vi) "Insured Event" and "BC Property" on page five.

Plaintiff propounded the Second Interrogatory to Chapin because Plaintiff believes that if this interrogatory is answered truthfully and completely by Mr. Chapin, it will reveal the Chubb criteria used to determine if Mr. Krum's FRV benefits under the Insurance Policy had been triggered.

Based on Plaintiff's own research Kurt Chapin was/is the "Vice President and Chief Technical Officer for property claims for all of the companies within the Chubb insurance group." *See Gibson v. Chubb National Insurance Company*, 2021 WL 4401434 *2 (N.D. Ill. 2021).

During Chubb Manager Matthew Witcher's deposition on November 9, 2022, he testified that the term in Mr. Krum's Insurance Policy "usually rent to others" (the "Term") triggers Mr. Krum's FRV coverage. Apparently, during a telephone conference in January 2020 with Mr. Chapin, within weeks after the Insured Event, Mr. Chapin, Chubb's "chief technical officer", was asked to define such Term. Chubb Manager Witcher describes the role of Mr. Chapin

Rather than serve a second interrogatory that complied with this Court's order, Plaintiff instead improperly served an interrogatory asking Mr. Chapin to "[i]dentify and define the meaning of the Chubb/Great Northern Insurance Policy term 'usually rent to others' as such term applied/applies to triggering the FRC coverage in the Insurance Policy concerning the Insured Event, the BC Property and Mr. Krum." *See* Ex. 1. This interrogatory as drafted is not meant to assist the Court with the relevant inquiry as to Mr. Chapin's recollection of the telephone conference, but is instead an improper attempt via interrogatory directed to a non-party Apex official to secure additional corporate representative testimony from GNIC beyond what was already permitted in the Rule 30(b)(6) deposition.

Despite the inappropriate interrogatory from Plaintiff, Mr. Chapin properly responded to the interrogatory actually permitted by this Court. His response confirms that "he has no specific recollection about the telephone conference that took place in January or February 2020 beyond the fact that ALE coverage under the Policy was discussed and the conversation may have included Tommy Le, Matthew Witcher and Corey Everett. Mr. Chapin recalls, generally, that the conversation related to the FRV coverage under the policy which includes the term 'usually rents to others; but has no recollection, specifically, what was discussed." *See* Ex. 2.

during this time, saying that Mr. Chapin is "someone who assists when there are questions out there regarding policy and coverage." *See* Matthew Witcher Nov. 9, 2022 Deposition Transcript ("WDT") at 283:11-20. Attached as **Ex. 3** are pages 1-5, 118-125, 278-285, and 330-333 of WDT.

Mr. Chapin acknowledges in his answer to Interrogatory One (attached **as Ex. 4**) that such a "conference" took place "in January or February 2020" post Insured Event "in which ALE coverage under the Policy was discussed". This directly corresponds with Witcher's testimony that such a conference took place with Chapin. Mr. Chapin's deposition would then allow Plaintiff to obtain discoverable information (which would be admissible under FRE 801d2A and/or D at trial) that Mr. which Witcher did not remember or was unwilling to provide at his Nov. 9 deposition in Los Angeles.

Chapin also acknowledges in his verified "response" to Interrogatory Two (**Ex. 2**), and he supplements his previous answer, by stating that the January or February 2020 telephone conference with Witcher "related to the FRV coverage under the policy which includes the term 'usually rents (sic) to others'". While Mr. Chapin now remembers a little more information about the conference, when prompted by this Court, curiously he "has no recollection, specifically, what was discussed."

Given this interrogatory response, Plaintiff has not met its initial burden to show this apex representatives has ***unique personal knowledge*** of some relevant issue. *See, e.g., Naylor Farms, Inc. v. Anadarko OGC Co.*, Case No. 11-cv-01528-REB-KLM, 2011 WL 2535067, *2 (D. Colo. June 27, 2011).

He has not shown this apex representative is the only source of the information, *see Cabrera v. Serv. Emps. Int'l Union*, No. 2:18-cv-00304-RFB-DJA, 2019 WL 6251451, at *2 (D. Nev. Nov. 22, 2019), or that the information cannot be had through other discovery like a corporate representative deposition, deposition of other persons or lower-level employees, or through interrogatories, *see Naylor*, 2011 WL 2535067 at *2; *see also Crown Cent. Petrol Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995). Not only has Plaintiff already deposed three other parties to the relevant conversation (i.e., Le, Witcher and Everett), but GNIC disclosed in August 2021 emails and meeting invitations on which Chapin was included. Thus, Plaintiff could have questioned the corporate representative (and the others) about the very topic at issue here. Accordingly, no additional deposition should be permitted.

Finally, to the extent Plaintiff suggests GNIC should be compelled to respond to the interrogatory, it should be noted the interrogatory was not directed

| | | |
|---|---|---|
| | Given that Mr. Chapin has admitted his participation in at least one conference which resulted in the insurer ultimately denying Mr. Krum's FRV claim, Plaintiff submits that now he should be permitted to depose Mr. Chapin to determine how, on behalf of Chubb, he (Chapin) defines "usually rent to others". Plaintiff argues to this Court that Chapin is a Chubb employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion and Chapin's opinion in fact forms the basis of any final decision by those with actual authority (*i.e*, Hamilton, Smith, Witcher, Le and/or Everett).  *See* **Ex. 3** WDT at 120:17-122:5 ("It's the company's position" that FRV was not triggered and "You're talking about the future potential to rent, which is not what that coverage is"). | to GNIC. As such, GNIC should not be compelled to respond. |
| | Plaintiff submits it is inconceiv-able that Mr. Chapin, as Chubb's Chief Technical Officer, was asked to define a material term in the Insurance Policy (for which provided hundreds of thousands of dollars of benefits to Mr. Krum) and yet he (Mr. Chapin) "has no recollection, specifically, what was discussed."  Such an answer needs to be fully examined/probed by a discovery deposition. | |
| | Or, in the alternative, Plaintiff respectfully requests that this Court Order Mr. Chapin to promptly answer Plaintiff's | |

Interrogatory No. Two. Such answer by Mr. Chapin will then either provide further evidence in support of why Plaintiff should be allowed to depose the witness who possesses first hand knowledge and "unique personal information" of the material term "usually rent to others" OR will allow Plaintiff at trial to offer into evidence and read to a jury the Chapin verified answer, thereby permitting Plaintiff to argue that either Mr. Witcher's testimony or Mr. Chapin's verified statement under oath was not truthful or at the very least intentionally misleading.

Plaintiff also reminds this Court that Plaintiff did not learn of this purported January or February 2020 meeting/conference (post Insured Event) to define a material coverage term ("usually rent to others") in Mr. Krum's Policy until the Witcher discovery deposition on November 9, 2022. This is *after* the Plaintiff took the depositions of Chubb Adjuster Le, Chubb Representative Everett, and Chubb Adjusters Magnotta and Mortensen when, conveniently, nothing was disclosed to Plaintiff regarding this "conference" with upper management where a material term (that is in dispute in this litigation) was defined by Defendant GNIC and Chubb post Insured Event.

Furthermore, and arguably most importantly, there are *no* File Notes contained in the 60,000 + page Chubb "Claim File" recording that such a meeting/ conference took place as testified

| | | |
|---|---|---|
| | to by Chubb Manager Witcher.<br><br>Kurt Chapin was never disclosed by name in the Defendant Great Northern's initial and supplemental Rule 26 disclosures.<br><br>GNIC previously represented to this Court that Hamilton and Chapin had "zero substantive involvement with Plaintiff's claim". Hamilton and Chapin's interrogatory answers clearly state otherwise.<br><br>Plaintiff should be allowed to take the deposition of Mr. Chapin to learn everything he can about this purported "secret meeting." | |
| Whether GNIC Representative Joseph R. Smith's February 10, 2023 Response Objections Should be Stricken as Untimely and Plaintiff Be Permitted to Depose Smith as Previously Requested and Noticed on October 13, 2022. | Pursuant to this Court's Order at ECF Doc. 220 on Jan. 10, 2023 Plaintiff served an interrogatory on Mr. Smith on Saturday, January 21, 2023. A copy of Plaintiff's Interrogatory to Joseph R. Smith is attached as **Ex. 5**. A copy of the February 10, 2023 Smith Interrogatory Response is attached as **Ex. 6**. This Court ordered the Smith Interrogatory Response "within 14 days thereafter [being served with the Interrogatory on Jan. 21], unless the parties agree otherwise." Plaintiff submits the Smith Response was required to be served on Plaintiff by Saturday, February 4, 2023. However, if this Court concludes that Fed. R. Civ. P. 6 still applies to this Court's Jan. 10th Order, then the Smith Response was required to be served no later than Monday, February 6, 2023, absent agreement of the parties.<br><br>Defense counsel has | The response from Mr. Smith was not served by the deadline given by this Court. However, this Court should note that Mr. Smith is no longer employed by GNIC. As such, GNIC had no control over whether he timely responded to the interrogatory or not. This Court should also note that Mr. Smith does not live within this Court's jurisdiction. Despite these facts, Mr. Smith agreed to voluntarily respond to the interrogatory. Neither Mr. Smith nor GNIC should be punished for the untimely response when Mr. Smith agreed to voluntarily respond (when he did not need to) and Plaintiff has not suffered any prejudice whatsoever from the 4-day delay (under Rule 6, the response would not have been due until February 6). |

| | | |
|---|---|---|
| | acknowledged they continue to represent Mr. Smith. | |
| Whether, based on his response to Interrogatory One, GNIC representative Joseph R. Smith should be compelled to answer the question propounded by the Plaintiff truthfully and completely. | Interrogatory One to Joseph R. Smith stated, "Identify the authority under which . . . Steven J. Magnotta acted when: (i) he [Magnotta] offered Mr. Krum '$564,000.00' as set forth on page three of Plaintiff's Deposition Exhibit 28 (the July 2020 Statement of Loss Summary Sheet also called an 'SOL') where it states . . . 'Agreement in Lieu of Appraisal Process'; and (ii) when he (Magnotta) stated that 'we previously offered to settle the THAS for $564K, but it was rejected by Mr. Krum' in/at Chubb_045626 - Chubb_045627 and Chubb_045696 - Chubb_ 045698."<br><br>Plaintiff's Interrogatory One to Smith defined the following terms: (i) "Identify" on page four; (ii) "SOL" on page nine; (iii) "Appraisal" on page nine; (iv) "Assess" or "Assessed" on page nine; (v) "In lieu of" on page ten; (vi) "Authority" on page ten; (vii) Plaintiff's Deposition Exhibit 28" on page ten; (viii) "Great Northern Employee" on page seven; (ix) "Great Northern Executive" on page seven; (x) "Corporate Hierarchy" on page seven; and (xi) "Chubb" on pages seven and eight.<br><br>Attached as **Ex. 7** is Plaintiff's (redacted) Deposition Exhibit 28, including page three, and attached as **Ex. 8** are Chubb_ 045626-Chubb_045627 and Chubb_045696-Chubb_045698. | Plaintiff's interrogatory directed to Mr. Smith asks him to "[i]dentify the ***authority*** under which Chubb Executive General Adjuster Steven J. Magnotta acted when: (i) he offered Mr. Krum '$564,000.00' as set forth on page three of Plaintiff's Deposition Exhibit 28 . . . and (ii) when he (Magnotta) stated 'We previously offered to settled the THAS for $564k, but it was rejected by Mr. Krum' in/at Chubb_045626-Chubb_045627 and Chubb)045696-Chubb_045698." *See* Ex. 5 (emphasis added). Notably, "authority" is expressly defined in the interrogatory as "[a] person or ***organization*** having control; the power or right to give orders, make decisions, and enforce obedience; and/or official permission." *See id.* at 10 (emphasis added). As the underwriter for the Policy at issue in this litigation, GNIC is the only organization which had control, the power or right to give orders, the power or right to make decisions, the power or right to enforce obedience, and/or the power or right to give official permission with respect to Plaintiff's claims. As such, the response from Mr. Smith is correct and appropriate. In this regard, Plaintiff's complaints about whether or not claims professionals communicated with individuals at GNIC is simply irrelevant.<br><br>To the extent Plaintiff suggests he |

Attached as **Ex. 9** is the Steven J. Magnotta October 15, 2021 Deposition Transcript ("MDT").

Plaintiff also incorporates herein by reference the well supported factual statements set forth in ECF Doc. 217, Plaintiff's Response and Opposition to Defendant GNIC's Motion for Protective Order.

In his Response to Interrogatory One, Mr. Smith stated that "Steven J. Magnotta received the authority to offer Mr. Krum $564,000.00 to settle his THAS claim from Defendant Great Northern Insurance Company.  Mr. Smith reserves the right to supplement this response as discovery progresses."

Witnesses for GNIC including Executive General Adjuster Steve W. Mortensen and GNIC Corporate Designee/30b6 Witness, Corey Everett, testified under oath that:

 (i) "I don't even know if there is a CEO of Great Northern." *See* Steven Mortensen September 27, 2021 Deposition Transcript ("SMDT") at 29:6-22 attached as **Ex. 10.**

(ii) Question: "Who did Witcher communicate with at Great Northern regarding my [I]nsured [E]vent?" Answer "Nobody". Corey Everett September 29, 2021 Deposition Transcript ("EDT") at 72:16-18 attached as **Ex. 11.**

(iii) Question: "Who did Mr. [Le] . . .  communicate with at Great

should be entitled to depose Mr. Smith, he has not met his initial burden to show this apex representatives has ***unique personal knowledge*** of some relevant issue. *See, e.g.*, *Naylor Farms, Inc. v. Anadarko OGC Co.*, Case No. 11-cv-01528-REB-KLM, 2011 WL 2535067, *2 (D. Colo. June 27, 2011).

He has not shown Mr. Smith is the only source of information, *see Cabrera v. Serv. Emps. Int'l Union*, No. 2:18-cv-00304-RFB-DJA, 2019 WL 6251451, at *2 (D. Nev. Nov. 22, 2019), or that the information cannot be had through other discovery like a corporate representative deposition, deposition of lower-level employees, or through interrogatories, *see Naylor*, 2011 WL 2535067 at *2; *see also Crown Cent. Petrol Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995).

Northern with regard to my
[I]nsured [E]vent?" Answer:
"Nobody." EDT at 72:19-21
attached as **Ex. 11.**

(iv) Question: "Who did Mr.
Magnotta communicate with at
Great Northern with regard to my
[I]nsured [E]vent?" Answer:
"Nobody." EDT at 72:22-24
attached as **Ex. 11.**

(v) Question: "Who did Mr.
Mortensen communicate with at
Great Northern with regard to my
[I]nsured [E]vent?" Answer:
"Nobody."  EDT at 72:25-73:2
attached as **Ex. 11.**

(vi) Question: "I asked you it
before and your answer was 'Mr.
Magnotta does not have any
contact with anybody at Great
Northern Insurance Company',
correct?"  Answer: "Yes sir."
EDT at 83:8-12 attached as **Ex.
11.**

(vii) Question: "In fact, no one
who is involved at any time
regarding the BC property, Mark
Jay Krum, and/or the [I]nsured
[E]vent, had contact with anyone
at Great Northern Insurance
Company, correct?" Answer:
"Yes sir." EDT at 83:13-18
attached as **Ex. 11.**

(viii) Question: "And 'contact' I
define as an in-person meeting, a
phone call . . . .  Am I correct?"
Answer: "Yes sir."  EDT at 83:19-
25 attached as **Ex. 11.**

(ix) Question: "Does anybody at
US Property Claims talk to

anybody at Great Northern?"
Answer: "Not that I know of."
EDT at 88:3-5 attached as **Ex. 11.**

(x) Question: "Are you aware of
any departments at Great
Northern?" Answer: "No sir."
EDT at 88:12-14 attached as **Ex.
11.**

(xi) "Is there any corporate
hierarchy of individuals at Great
Northern Insurance Company to
your knowledge?" Answer: "Not
that I am aware of." EDT at 90:9-
15 attached as **Ex. 11.**

The sworn deposition testimony of
the GNIC Corporate Designee,
Corey Everett, directly contradicts
the sworn verification of Senior
VP Joseph R. Smith, who in his
Response to Interrogatory One
states that "Mr. Steven J. Magnotta
received authority to offer Mr.
Krum $564,000.00 to settle the
THAS claim from Defendant
Great Northern Insurance
Company." According to Corey
Everett, the GNIC Corporate
Designee, no one at Great
Northern has ever spoken to
anyone regarding Mr. Krum, his
BC property, or the Insured Event;
and there is no corporate hierarchy
of individuals at Great Northern.

Exactly, how, then, is it possible,
for Mr. Magnotta to have been
given "authority" by GNIC to
offer $564K to settle the THAS
portion of the claim as Mr. Smith
declares under penalty of perjury
in his response to Interrogatory
One? Mr. Smith is not telling the
truth considering that no one

involved in Mr. Krum's claim has ever spoken to an individual at Great Northern, no one at U.S. Property Claims has ever spoken to any individual at Great Northern, and no one is even aware that a CEO or corporate hierarchy even exists at Great Northern. OR , Mr. Smith needs to explain exactly who at Great Northern gave Mr. Magnotta the authority in July 2020 to attempt to improperly and with bad faith conduct leverage Mr. Krum into a first party settlement.

These very contradictory statements which pertain to a material fact in dispute in the instant claim is precisely why Plaintiff should be allowed to fully depose Mr. Smith on the issues set forth above.

Furthermore, Mr. Magnotta's deposition testimony is astonish-ing, given its ironic and complete contradiction to Mr. Smith's verified statement and internal Chubb claim documents to/from Mr. Smith.  This alone should allow deposition discovery from Mr. Smith.  *See* ECF Doc. 217 at 11-15.

Plaintiff submits that a deposition of Mr. Smith will allow Plaintiff to obtain significant and essential discoverable evidence to support his THAS bad faith claims, in that, Mr. Smith, himself, approved Mr. Magnotta's bad faith conduct as set forth in Plaintiff's Expert Reports.

Joseph Smith was never disclosed

| | | |
|---|---|---|
| | by name in the Defendant Great Northern's initial and supplemental Rule 26 disclosures.<br><br>Lastly, Plaintiff brings to the attention of this Court that it previously granted Plaintiff permission to take thirteen (13) depositions in this case (even *before* the NY PRMS case was consolidated with the instant case). Prior to noticing the discovery depositions of Smith (on October 13, 2022) and Chapin (on November 13, 2022) more than 80 days before the close of discovery, Plaintiff had only taken nine (9) depositions.<br><br>Respectfully submitted. | |

TAB 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 20-cv-03616-RM-NRN

MARK JAY KRUM,

      Plaintiff,

v.

CHUBB LIMITED,
GREAT NORTHERN INSURANCE COMPANY,
CELIA SANTANA,
DALE KRUPOWICZ, and
PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,

      Defendants.

---

**ORDER**

---

      Plaintiff, an attorney proceeding pro se in this matter, filed this lawsuit in December 2020 after a sprinkler head inside his home failed, causing significant water damage, and his insurer, Defendant Great Northern Insurance Company ("Great Northern"), declined to pay certain claimed damages.  In his Amended Complaint, Plaintiff asserts claims against Great Northern for breach of contract, common law and statutory bad faith, fraudulent and negligent misrepresentation, and violation of the Colorado Consumer Protection Act ("CCPA").[1]

      In October 2021, Plaintiff filed a related action in the Supreme Court of the State of New York against Defendant Personal Risk Management Solutions, LLC ("PRMS"), the insurance broker that assisted Plaintiff in procuring his policy with Great Northern, asserting claims for

---

[1] Plaintiff asserts substantially similar claims against Defendant Chubb Limited, but it has not been served.

A3005

breach of contract, negligence, breach of fiduciary relationship and duty of loyalty, and negligent

misrepresentation.  The gist of these claims is that PRMS and its employees, Defendants Santana

and Krupowicz (collectively, the "Broker Defendants"), misled Plaintiff about the coverage

provided under his policy with Great Northern and failed to procure appropriate coverage.[2]

After PRMS removed the action to the United States District Court for the Southern District of

New York, it was transferred to this District and subsequently consolidated into this lawsuit.

      Ten motions are now pending in this matter: three motions for summary judgment, four

motions to exclude, one objection to a discovery order, one motion to supplement, and one

motion to strike.  This Order addresses each of them and directs that the case be closed.

## I.  BACKGROUND

      Plaintiff insured his luxury residential property in Beaver Creek, Colorado, under a policy

issued by Great Northern.  On December 24, 2019, a sprinkler head inside the four-level

residence released hundreds of gallons of liquid that caused significant damage to the property.

Plaintiff's claim was largely resolved pursuant to a limited mutual release agreement.  However,

that agreement did not fully resolve Plaintiff's claims for extra living expenses ("ELE")

coverage, fair rental value ("FRV") coverage, and damage to his theatre and home automation

systems ("THAS").  The claims in this lawsuit are premised solely on these coverages.  (*See* ECF

No. 225 at 4.)

---

[2] The Amended Complaint in this action asserts claims against Defendants Santana and Krupowicz for negligence, breach of fiduciary relationship and duty of loyalty, and negligent misrepresentation.

Plaintiff contends that his policy provides for $2,069,100 in additional living expenses ("ALE") coverage, which includes both the ELE and FRV coverages. (ECF No. 31, ¶ 125.) The ALE provision of the policy provides, in pertinent part, as follows:

> As described below, under certain conditions when your house or other permanent structure cannot be lived in during your usual vacation occupancy because of a covered loss to your house or other permanent structure or, if applicable, its contents, we provide coverage for additional living expenses which consists of extra living expenses, loss of fair rental value, and forced evacuation expenses. The maximum amount we will pay for all additional living expenses combined for each occurrence is 30% of the amount of house coverage as shown in your Coverage Summary for the location at which the loss occurs.

(ECF No. 94, at 24.)

The policy's ELE provision provides:

> If a covered loss makes your house or other permanent structure uninhabitable during your usual vacation occupancy, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use.

> We will pay for the boarding of your domestic animals displaced from an other permanent structure even when you have not been displaced by the covered loss. We cover these increases for the reasonable amount of time required to restore your house or other permanent structure to a habitable condition, or if you or members of your household permanently relocate, the shortest amount of time required to settle elsewhere. However, if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, we only cover the increase in your normal living expenses incurred by you for the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss. We cover these extra living expenses for up to 60 days, even if the policy period ends during that time.

(*Id.* at 24-25.) Plaintiff received $22,451.77 in ELE benefits from Great Northern but argues he is entitled to "maximum" coverage under the policy. (ECF No. 284 at 1; ECF No. 290, ¶ 9.)

And the FRV provision provides:

> If a covered loss makes a part of your house or other permanent structure which you usually rent to others uninhabitable, we cover its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition.  We cover fair rental value for up to 15 days, even if the policy period ends during that time.

(ECF No. 94 at 25.)  Great Northern disclaimed FRV coverage on the grounds that Plaintiff failed to demonstrate the property was usually rented to others.  (ECF No. 290, ¶ 13.)

The policy also includes an appraisal provision.  (ECF No. 94 at 48.)  Because Great Northern and Plaintiff could not agree on the amount of coverage available for damage to his THAS, Plaintiff demanded an appraisal in June 2020.  (ECF No. 290, ¶ 20.)  Shortly after the appraisal award was entered in May 2021, Great Northern paid the amount of the award (about $1.2 million) less prior payments for the THAS.  (*Id.* at ¶¶ 21, 23.)

## II.   SUMMARY JUDGMENT

The Court will first address the pending Motions for Summary Judgment, (ECF Nos. 243, 244, 252), which have been fully briefed (ECF Nos. 263, 268, 276, 281, 284, 289).

### A.   Legal Standard

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018).  Applying this standard requires viewing the facts in the light most favorable to the nonmoving party and resolving all factual disputes and reasonable inferences in its favor. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a

matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.  *Anderson*, 477 U.S. at 248.

## B.   Plaintiff's Motion

In his Motion, Plaintiff seeks a ruling that the arbitration award entered in this case "conclusively established the amount of loss" related to his THAS and "is binding."  (ECF No. 252 at 3.)  Great Northern does not dispute this.  (ECF No.268 at 1.)  As a general matter, "an appraisal award issued under an insurance policy is binding so long as the appraisers (including the umpire) have performed the duties required of them by the policy."  *Andres Trucking Co. v. United Fire & Cas. Co.*, 488 P.3d 425, 433 (Colo. App. 2018).  Such an award "may be disregarded only if the award was made without authority or was made as a result of fraud, accident, or mistake."  *Id.* at 434.  No such allegations are present here.  Accordingly, the Court will grant Plaintiff's Motion without belaboring this issue.  To the extent Great Northern's Response requests that the Court disregard or strike Plaintiff's "improper attempt to seek untimely admissions for his bad faith claims" (ECF No. 268 at 3), that request is denied for failure to comply with D.C.COLO.LCivR 7.1(d), which requires that "[a] motion shall not be

included in a response or reply to the original motion.  A motion shall be filed as a separate document."

### C.     Great Northern's Motion

Great Northern contends that it has paid Plaintiff all the benefits owed under the policy and is entitled to summary judgment on all his claims against it.  The Court agrees Plaintiff has failed to raise genuine issues of material fact that would preclude granting summary judgment.

### 1.     Breach of Contract Claim

To state a claim for breach of contract under Colorado law, a plaintiff must show (1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (en banc).  An insurance policy is a contract that courts interpret by applying well-settled principles of contract interpretation, such as, giving the words their plain and ordinary meaning unless contrary intent is evidenced in the policy, seeking to give effect to all provisions so that none is rendered meaningless, and being wary of rewriting provisions.  *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020).  Where terms in a contract are susceptible to more than one reasonable interpretation, they must be construed broadly in favor of the insured, but that does not mean a court must adopt the insured's view wholesale.  *Id.* at 1259-60.  Rather, any interpretation of ambiguous terms must comport with the policy's remaining provisions.  *Id.* at 1260.

a.      *ELE coverage*

Great Northern argues that Plaintiff has not submitted documentation demonstrating he incurred any further increase in ELE beyond what has been reimbursed.  (*See* ECF No. 243 at 7.) In response, Plaintiff cites a letter from Great Northern stating that it had already paid ELE benefits for seven nights at the Ritz-Carlon, leaving fifty-three days of ELE benefits remaining. (ECF No. 286-6 at 3.)  The letter further states that Great Northern would approve additional rental payments (totaling more than $1.1 million) upon Plaintiff's submission of verification that he had incurred additional rental costs.  (*Id.*)  However, nowhere does Plaintiff identify any evidence that he incurred such costs or submitted appropriate verification, much less support his claim that "he has sustained ELE and FRV economic damages well in excess of four million dollars."  (ECF No. 284 at 5.)  Instead, his Response merely lists various requests he made for ELE hotel and housing accommodations that Great Northern purportedly denied.  (*See id.* at 6-7.)  But Plaintiff fails to present evidence supporting his contention that these requests were improperly denied.  *See KAT Constr. Mgmt. LLC v. Safeco Ins. Co. of Am.*, No. 19-cv-02981-RM-KLM, 2022 WL 136905, at *4 (D. Colo. Jan. 14, 2022) (concluding the insurer's obligation under a similar provision "was to pay no more than the financial liability actually experienced" by the insured).  Where, as here, the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it can meet its initial burden by pointing out the lack of evidence on an essential element of the nonmoving party's claim.  *Adams v. Am Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).  At that point, the burden shifts to the nonmoving party to identify sufficient evidence that is pertinent to the material issue by reference to an

7

A3011

affidavit, deposition transcript, or specific exhibit.  *Id.*  Plaintiff has failed to meet his burden to show a genuine issue for trial as to ELE coverage.

Plaintiff's Response also addresses the issue of whether the policy provides more than sixty days of ELE coverage under the circumstances of this case.  However, in the absence of any showing that Plaintiff is entitled to any ELE benefits beyond what he received, the Court finds this issue is not yet ripe.  In short, adopting Plaintiff's proposed interpretation of the sixty-day provision of the policy would not change the outcome as the matter now stands.

        b.    *FRV coverage*

With respect to FRV coverage, Great Northern contends there is no evidence Plaintiff rented the property after January 3, 2016, and therefore he failed to meet the policy's requirement that he "usually rent to others."  (ECF No. 94 at 25.)  In his Response, Plaintiff asserts that because he has rented the property in the past and the phrase "usually rent to others" is not defined in the policy, whether he is entitled to additional FRV benefits is a question for the jury.  (ECF No. 284 at 17.)  But under the circumstances presented, the Court does not find the plain and ordinary meaning of the phrase "usually rent to others" contemplates coverage where the prior rentals occurred four or more years ago and have not happened since.  Plaintiff's proposed interpretation would fail to give effect to the word "usually" and seemingly provide coverage if the property had ever been rented.  Plaintiff has identified nothing in the policy evidencing the parties' intent to provide such extensive coverage, and so the Court declines to construe the FRV provision in the manner he proposes.

Nor do Plaintiff's allegations about his intent to rent the property or others' inquiries about the possibility of renting the property fit within the concept of "usually rent[ing] to others."

8

**A3012**

Again, applying the plain and ordinary meaning of the words in the FRV provision, one does not "usually" perform acts merely by intending to perform them or by fielding inquiries about the possibility they might be performed in the future.  At the time of the covered loss, Plaintiff simply was not normally or habitually renting the property.  *See New Oxford American Dictionary* (3d ed. 2010) (defining "usually" to mean "under normal conditions"). Thus, the Court finds Plaintiff has failed to establish the existence of a genuine issue of material fact based on Great Northern's refusal to provide FRV coverage.

c.   *THAS damage*

Based on Plaintiff's Response and other circumstances of this case, it is not clear that Plaintiff intends to pursue a breach of contract claim related to coverage for his THAS.  The Response mentions THAS coverage only in relation to Plaintiff's bad faith claims.  (*See* ECF No. 284 at 1-2.)  Moreover, in its Response to Plaintiff's Motion for Partial Summary Judgment, Great Northern asserts that Plaintiff concedes that his breach of contract claim is limited to alleged coverage for ELE and FRV (ECF No. 268 at 2 n.1), and Plaintiff fails to address that assertion in his Reply.  In addition, with the Court's granting of Plaintiff's Motion for Partial Summary Judgment, the amount of loss related to Plaintiff's THAS has been conclusively established.  And there is no dispute that Plaintiff has been paid in full the amount of the appraisal award.  Neither the appraisal award nor Great Northern's payment establishes that any payment was owed sooner.  Therefore, the Court discerns no viable claim for breach of contract premised on coverage for Plaintiff's THAS.

2.   Bad Faith Claims

To prevail on his common law bad faith claim, Plaintiff must establish that Great

9

A3013

Northern acted unreasonably and knew or recklessly disregarded the unreasonableness of its conduct.  *See Sandoval v. Unum Life Ins. Co. of Am.*, 952 F.3d 1233, 1236 (10th Cir. 2020).  To prevail on his statutory bad faith claim, Plaintiff must establish that Great Northern delayed or denied payment of a covered benefit without a reasonable basis.  *See* Colo. Rev. Stat. § 10-3-1115(1)(a).  Great Northern contends that both Plaintiff's bad faith claims fail because its claim handling and coverage positions were reasonable under the circumstances.  (*See* ECF No. 243 at 12.)  The Court finds that the absence of evidence that Great Northern acted unreasonably is fatal to both of these claims.

With respect to Plaintiff's claims for ELE and FRV coverage, the mere fact that Plaintiff disagrees with Great Northern's coverage decisions is insufficient to give rise to a bad faith claim.  *See Yale Condos. Homeowner's Assoc., Inc. v. Am Fam. Mut. Ins. Co.*, No. 19-cv-02477-KMT, 2021 WL 1222518, at *7 (D. Colo. Apr. 1, 2021) ("Unreasonable conduct cannot be established by virtue of a mere disagreement of value between the insured and insurer . . . .").  Plaintiff has not identified evidence in the record showing that he actually incurred an increase in the normal living expenses that was necessary to maintain his household's usual standard of living.  Because Plaintiff has failed to establish that he was entitled to additional ELE benefits, he has not shown that Great Northern's failure to pay additional ELE benefits was unreasonable.

Further, to the extent Plaintiff disagrees with Great Northern's position that he failed to demonstrate he usually rented the property to others, he has not shown that its interpretation of the FRV provision is unreasonable.  Although Plaintiff implies that further investigation by Great Northern would have shown he was entitled to FRV coverage, he fails to provide any material information that Great Northern did not have or to refute the fact that the property had not

actually been rented for nearly four years preceding the insured event.  Therefore, Plaintiff has identified no evidence that further investigation by Great Northern would have made any difference or that whatever investigation it did perform was inadequate.

Plaintiff also appears to assert that Great Northern's alleged failure to timely inform him about the sixty-day limitation on FRV coverage constitutes unreasonable conduct.  (*See* ECF No. 284 at 16-17.)  However, the Court has already determined that Plaintiff has not shown Great Northern was required to provide any additional ELE benefits—regardless of whether the sixty-day limitation applies to the circumstances of this case.  Accordingly, the Court finds he has not shown that Great Northern acted unreasonably by not informing him about the limitation sooner than it did.

With respect to Plaintiff's claim for additional coverage related to the THAS, he contends that Great Northern's entire course of conduct is relevant but fails to identify any specific conduct that forms the basis of his bad faith claims.  (*See* ECF No. 284 at 17-18.)  Conclusory allegations of unreasonable conduct are insufficient to survive summary judgment.  *See Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refin. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995).  Moreover, Great Northern duty to negotiate as a reflection of good faith was suspended once Plaintiff demanded appraisal.  *See Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010).  The fact that the parties disagreed about the value of Plaintiff's THAS does not mean that Great Northern's assessment was unreasonable.  *See id.* at 1221.

In the absence of any evidence of unreasonable conduct by Great Northern, Plaintiff's bad faith claims fail as a matter of law.

3.      Misrepresentation Claims

To state a claim for fraudulent misrepresentation under Colorado law, a plaintiff must allege (1) a knowing misrepresentation of material fact; (2) reliance on the material misrepresentation; (3) the right or justification in relying on the misrepresentation; and (4) reliance resulting in damages.  *See Clark v. Green Tree Servicing LLC*, 69 F. Supp. 3d 1203, 1223 (D. Colo. 2014).  To state a claim for negligent misrepresentation, he must plausibly allege that

> (1) one in the course of his or her business, profession or employment; (2) makes a misrepresentation of a material fact, without reasonable care; (3) for the guidance of others in their business transactions; (4) with knowledge that his or her representations will be relied upon by the injured party; and (5) the injured party justifiably relied on the misrepresentation to his or her detriment.

*Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011) (en banc).

In its Motion, Great Northern argues that Plaintiff fails to identify the false information and false statements that support his fraudulent and negligent misrepresentation claims.  (ECF No. 243 at 17-18.)  In his Response, Plaintiff persists in arguing that he "does in fact identify the false information and false statements upon which he relied" (ECF No. 284 at 19 n.31, n.33), yet the paragraphs in the Amended Complaint he cites are devoid of any allegations identifying any specific misrepresentations.  (*See* ECF No. 31, ¶¶ 324-45.)  Further, Plaintiff does not set forth the other elements necessary to establish either type of claim, much less show how evidence in the record establishes the existence of a genuine issue as to whether such elements are satisfied.  Thus, the Court finds Great Norther is entitled to summary judgment on these claims as well.

4.      CCPA Claim

To state a claim under the Colorado Consumer Protection Act ("CCPA"), a plaintiff must

show

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the
> challenged practice occurred in the course of defendant's business, vocation, or
> occupation; (3) that it significantly impacts the public as actual or potential
> consumers of the defendant's goods, services, or property; (4) that the plaintiff
> suffered injury in fact to a legally protected interest; and (5) that the challenged
> practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo.

2003) (en banc).  Regarding the third element, Great Northern argues that "this private insurance

dispute does not impact the public as required to state a CCPA claim."  (ECF No. 243 at 19.)

Plaintiff does not meaningfully address this deficiency, arguing in response that he "should be

able to put before a jury that the facts establish the requisite 'public impact' needed to state a

claim under the CCPA" (ECF No. 284 at 20) while providing no evidence demonstrating the

existence of a genuine dispute of material fact as to the public impact of this case.  A more

substantial showing is required to survive summary judgment; therefore, the Court finds Great

Northern is entitled to summary judgment on Plaintiff's CCPA claim as well.

In sum, Plaintiff has failed to adduce necessary evidence in support of each of his claims

against Great Northern, and the Court finds that entry of summary judgment in its favor is

appropriate.

**D.      Broker Defendants' Motion**

The Broker Defendants contend they are entitled to dismissal of the claims against them

which are all premised on their role in assisting Plaintiff with procuring the policy at issue.

Because the Court accepts the Broker Defendants' argument that Plaintiff cannot prove

13

causation, it need not reach the issue of whether his disclosed expert, an insurance broker, is qualified to provide evidence in support of his claims for negligence, breach of fiduciary duty, and negligent misrepresentation.

As noted above, Plaintiff and Great Northern resolved much of his claim with a limited mutual release agreement.  In addition, the Court has already concluded that Plaintiff has not shown he is entitled to additional ELE or FRV benefits under the policy.  Further, Plaintiff has not shown he is entitled to any benefits that exceed the policy limits.   Thus, Plaintiff cannot demonstrate that any negligence by the Broker Defendants caused him damages.  Put differently, because Plaintiff did not exhaust the coverage limits under the policy he had, the possibility that he could have obtained more coverage (even unlimited coverage) is insufficient to raise a genuine issue that he incurred damages that were caused by the Broker Defendants.

Citing *Gibbons v. Ludlow*, 304 P.3d 239, 245 (Colo. 2013), the Broker Defendants argue that under Colorado law a claim for professional negligence against a real estate broker, like a claim for professional malpractice, requires that "a plaintiff must show that, but for the alleged negligent acts of the broker, he either: (1) would have been able to obtain a better deal in the underlying transaction; or (2) would have been better off by walking away from the underlying transaction."  Extending that framework by analogy to the circumstances here, the Broker Defendants argue that "Plaintiff has to prove he would have received additional insurance proceeds but for [their] negligence" and that he cannot do so.  (ECF No. 244 at 11.)

In his Response, Plaintiff does not discuss *Gibbons* or dispute that he must show he would have received additional benefits to establish causation.  (*See* ECF No. 263 at 19-20.) Instead, he asserts that the Broker Defendants placed him in a policy with "incorrect coverage

14

**A3018**

limits" instead of the unlimited ELE and FRV coverages he allegedly requested. (*Id.*)  But in the absence of evidence that he was entitled to additional ELE and FRV benefits, his speculation about other benefits to which he might have been entitled had he been insured under a different policy is insufficient to present a genuine issue of material fact.  He has failed to adduce evidence that he would have been in a better position had the Broker Defendants obtained additional ELE and FRV coverage.  Nor has he shown that he was precluded from obtaining additional benefits because he had a "Vacation Home Policy" as opposed to some other type of policy he might have obtained.  (*Id.*)

Therefore, the Court finds Plaintiff has also failed to adduce necessary evidence in support of his claims against the Broker Defendants, and they are also entitled to summary judgment.

## III.    OTHER MOTIONS

Having resolved the summary judgment motions, the Court now briefly addresses the six other motions that are pending.

### A.    Motions to Exclude

Great Northern has moved to exclude the proffered expert opinions and testimony of S. Robert Landow, arguing that he improperly attempts to usurp this Court's role by instructing the jury on legal standards, improperly attempts to usurp the jury's fact-finding function, and fails to articulate prevailing industry standards.  (ECF No. 224.)  In light of the Court's determination that Great Northern is entitled to summary judgment on all Plaintiff's claims, the Court finds this Motion is moot.

Plaintiff has moved to exclude the proffered expert opinions and testimony of Great Northern's expert, Kearson M. Strong, arguing that her testimony pertaining to claims resolved by the limited mutual release agreement should not be admitted.  (ECF No. 225.)  Because the Court has already determined that Great Northern is entitled to summary judgment, this Motion, too, is now moot.

Plaintiff has also moved to exclude the proffered expert opinions and testimony of Matt A. Coleman because he is not licensed in New York to provide property insurance.  (ECF No. 226.)  Because the Broker Defendants have prevailed on their Motion for Summary Judgment, the Court also denies this Motion as moot.

The Broker Defendants have moved to exclude the expert testimony of William Curtis. (ECF No. 228.)  As discussed above, the Court resolved the Broker Defendants' Motion for Summary Judgment without needing to rule on the admissibility of Mr. Curtis's testimony. Accordingly, the Motion is moot.

### B.      Plaintiff's Objection

Plaintiff has filed an Objection (ECF No. 259) to the magistrate judge's February 27, 2023, Order (ECF No. 242) addressing several discovery disputes.  Plaintiff seeks to have the Order vacated to the extent that he be allowed to dispose two witnesses.

This Court can modify or set aside a magistrate judge's order on a nondispositive matter only if it is clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997).  The Court must have "a definite and firm conviction that a mistake has been committed."  *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quotation omitted).

16

A3020

Here, with respect to the first witness, Plaintiff was granted leave to serve a single interrogatory regarding a February 2020 conversation in which the witness participated. (*See* ECF No. 242 at 2.)  However, the interrogatory Plaintiff tendered sought substantive answers about policy definitions and did not inquire about the witness's recollection of the February 2020 conversation.  (*Id.*)  The magistrate judge denied Plaintiff's request to compel the witness to respond to the interrogatory and deemed the witness to have adopted a statement to the effect that he recalled, generally, that the conversation dealt with FRV coverage under the policy but did not have any specific recollection about what was discussed.  (*Id.*)

Plaintiff has not shown that the magistrate judge's Order is clearly erroneous or contrary to law.  Nor has he presented a scenario that leaves the Court with a firm conviction that a mistake has been committed.  Further, the Court has already determined that the phrase "usually rent to others" as used in the FRV provision of the policy bars Plaintiff's claim for FRV benefits and that Great Northern's interpretation of the provision was not unreasonable.  Although the magistrate judge could not have foreseen these determinations when the ruling was made, they lend further support to the Court's perception that the magistrate judge's Order did not unfairly or improperly limit Plaintiff's ability to conduct discovery in this case.

With respect to the second witness, Plaintiff seeks additional information regarding the handling of his claim for coverage related to the THAS.  The magistrate judge found that the witness had fully answered the interrogatory posed to him and stated that "[t]he fact that [Plaintiff] disbelieves that answer is not a basis for further relief."  (ECF No 242 at 3.)  The magistrate judge further found that Plaintiff had failed to articulate good cause for amending the scheduling order to extend the discovery period, which had by then closed.  (*Id.*)

Again, Plaintiff has not shown that the magistrate judge's Order is clearly erroneous or contrary to law or that a mistake was committed.  The fact that the parties disagreed about the value of Plaintiff's THAS until the appraisal award was issued is not disputed.  Given that Great Northern's obligation to negotiate was suspended during the appraisal process, Plaintiff has not shown how this witness's purported involvement settlement negotiations during that time is relevant.  Nor has he shown that any such involvement was substantive.  Moreover, Plaintiff has not explained adequately why he could not have deposed the witness before the discovery period ended.  Under the circumstances, the Court discerns no error with respect to the magistrate judge's handling of this issue.

Accordingly, the Court finds Plaintiff's Objections to magistrate judge's February 27, 2023, Order lack merit, and they are overruled.

### C.      Plaintiff's Motion to Supplement

Plaintiff has also filed an "Additional Objection" (ECF No. 260), requesting that certain exhibits pertaining to his previous Objection be included in the record.  The Court construes this as a Motion to Supplement.  Defendants did not object to the request, and the Court discerns no basis for denying it.  Therefore, the Motion is granted.

### D.      Great Northern's Motion to Strike

Great Northern has also filed a Motion to Strike (ECF No. 270), seeking to strike Plaintiff's Amended Statement of Undisputed Facts (ECF No. 253) for failure to comply with this Court's Civil Practice Standard IV.C.2.c.2, D.C.COLO.LCivR 56.1(c), and the Court's Scheduling Order.  The Amended Statement pertains to Plaintiff's Amended Motion for Partial Summary Judgment (ECF No. 252), which Defendants did not oppose, and the Court has already

18

**A3022**

concluded should be granted.  In light of the procedural posture of this case, the Court finds this

Motion is now moot.

**IV.     CONCLUSION**

For the reasons above, the Court ORDERS:

(1)      the Motions for Summary Judgment (ECF Nos. 243, 244, 252) are GRANTED;

(2)      the Motions to Exclude (ECF Nos. 224, 225, 226, 228) are DENIED AS MOOT;

(3)      Plaintiff's Objection (ECF No. 259) is OVERRULED;

(4)      Plaintiff's Motion to Supplement (ECF No. 260) is GRANTED; and

(5)      Great Northern's Motion to Strike (ECF No. 270) is DENIED AS MOOT.

No claims remain, and therefore the Clerk is directed to CLOSE this case.

DATED this 15th day of August, 2023.

BY THE COURT:

RAYMOND P. MOORE
Senior United States District Judge

A3023


TAB 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03616-RM-NRN

MARK JAY KRUM

       Plaintiff,

v.

CHUBB LIMITED,
GREAT NORTHERN INSURANCE COMPANY,
CELIA SANTANA,
DALE KRUPOWICZ, and
PERSONAL RISK MANAGEMENT SOLUTIONS, LLC

       Defendants.

---

### AMENDED FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Amended Final Judgment is hereby entered.

Pursuant to the Order (Doc. 292) entered on August 15, 2023, and the Order (Doc. 317) entered on September 29, 2023, both by Judge Raymond P. Moore, it is hereby:

ORDERED that judgment is entered in favor of Plaintiff, Mark Jay Krum, and against Defendant Great Northern Insurance Company on Plaintiff's Amended Motion for Partial Summary Judgment.

It is further ORDERED that judgment is entered in favor of the Defendants, Great Northern Insurance Company; Celia Santana; Dale Krupowicz; and Personal Risk Management Solutions, LLC, and against Plaintiff, Mark Jay Krum, on Defendants' motions for summary judgment.

**A3055**

It is further ORDERED that Defendant Chubb Limited is hereby dismissed without

prejudice.  It is further ORDERED that this case remains closed.

Dated this 29th day of September, 2023.

FOR THE COURT:


By:   s/C. Pearson, Deputy Clerk, for
      JEFFREY P. COLWELL
      Clerk of Court